Ervin G. TAYLOR, Petitioner-Appellant,

v.

Joseph S. HOPPER, Warden, Georgia State Prison, Respondent-Appellee.

No. 78–2623.

United States Court of Appeals, Fifth Circuit.

June 15, 1979.

Rehearing and Rehearing En Banc Denied Aug. 1, 1979.

James C. Bonner, Jr., Athens, Ga., for petitioner-appellant.

Arthur K. Bolton, Atty. Gen., Robert S. Stubbs, II, Don A. Langham, John C. Walden, Harrison Kohler, Asst. Attys. Gen., Atlanta, Ga., for respondent-appellee.

Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge.

This habeas corpus appellant, Ervin G. Taylor, was indicted in the Superior Court of Muscogee County, Georgia, for the offenses of criminal attempt-armed robbery, a felony, Ga.Code Ann., §§ 26–1001, 26–1006, and felony murder, Ga.Code Ann., § 26–1101(b). He was tried and convicted, along with a co-defendant, Michael Farley.[1] Both men were sentenced to serve consecutive terms of life for felony murder and ten years for attempted armed robbery.[2]

---

1. As to Farley's case, see *Farley v. State*, 238 Ga. 181, 231 S.E.2d 761 (1977).

2. On appeal, the Supreme Court of Georgia set aside Farley's sentence for the attempted armed robbery because it was a lesser included offense in the felony murder.

Taylor took no direct appeal. Afterwards, acting *pro se,* he sought writs of habeas corpus in the state courts on the ground that his confinement violated his constitutional right as an indigent to the assistance of counsel. The Supreme Court of Georgia affirmed the denial of habeas corpus relief, *Taylor v. Ricketts,* 239 Ga. 501, 238 S.E.2d 52 (1977).

With the assistance of counsel, Taylor then petitioned the United States District Court, which adopted the findings of the state courts and dismissed the petition. From this, Taylor has appealed and we heard oral argument in Atlanta on February 15, 1979.

This was not a case in which an indigent was denied the assistance of counsel. Counsel, whose competency stands unchallenged, had been appointed for him and stood ready to represent him at trial, but the defendant, on his own motion and without cause, dismissed his counsel after a jury had been selected and jeopardy had attached.

We affirm the denial of habeas corpus relief.

## I

### The Trial on the Merits in State Court

We have read the transcript of the state court trial, which began on March 22, 1976.

William S. Cain, Esq., of the Columbus, Georgia Bar, appeared for Mr. Taylor. Michael E. Garner, Esq., also of Columbus, appeared for the defendant Farley. The trial jury was selected and sent to the jury room.

At this point, the following transpired:

THE COURT: All right, was there something you wanted to say to the Court, Mr. Taylor?

MR. TAYLOR: Yes, sir. Your Honor, Mr. D.A., I wish not for Mr. Cain to represent me.

THE COURT: You wish to represent yourself?

MR. TAYLOR: Yes, I would.

THE COURT: All right, he has that right. You have mighty competent counsel, Mr. Taylor. You couldn't have hired any more competent or vigorous counsel than Mr. Cain. He would represent you vigorously, the Court is confident, without any reservations, but you do have the choice of representing yourself. But I want the record to show, Mr. Reporter, that Mr. Cain is available and has represented him up to this point and is willing to continue representing him. However, there is no law that allows us to force counsel on a defendant. And if it's your choice to represent yourself, you are doing that voluntarily at this point, and I will relieve Mr. Cain if you insist, but it's at your insistence.

MR. TAYLOR: Well, Your Honor, it's like he just might not be in my best favor.

THE COURT: Well, Mr. Taylor, I'm not questioning that that might be your opinion, but I can state that I know that that is not true. But still it's your choice to represent yourself, and if you want to represent yourself you may do so.

MR. TAYLOR: Yes, sir, I would like to.

THE COURT: Then, Mr. Cain, you are relieved of this case.

MR. CAIN: Your Honor, I do feel that in fairness I would like to put the motion into the record at a later time, the motion that we discussed.

THE COURT: You may do that.

MR. CAIN: I feel as though I do have that moral responsibility.

THE COURT: You may do so.

After the prosecutor made his opening statement and Mr. Garner reserved his, the following took place:

THE COURT: Mr. Taylor, you have the right to make an opening statement, which would not be an argument of the case, but merely a statement of what you intend the evidence to show on your behalf. You may make that at this time or at the conclusion of the State's presentation of the evidence, since you have chosen to represent yourself. The Court

wants you to understand that. Do you care to make any opening statement to the jury as to what you expect the evidence to show?

MR. TAYLOR: Yes, sir. I would just like the evidence to show the emotions of the case and whereabouts I was and the eye witness.

THE COURT: All right.

MR. TAYLOR: Thank you, sir.

Harland Norris, a state witness, was at the TCR service station on Brown Avenue at about 9:20 P.M., June 20, 1975. He was talking to James Allen:

Then there was (sic) two guys came up on the station lot, and they came around and kindly to our side, and then walked up there and pulled a gun. The one that shot James told him that this was a robbery. And James throwed his hand into his pocket and that's when he shot him.

Q. First he said, this is a holdup, is that right?

A. Yes.

Q. And then James did what?

A. Then James turned around and then he said, oh, no, and then he throwed his hand into his back pocket.

Q. Which back pocket?

A. In his right back pocket.

Q. Do you know for a fact what he had there in his pocket?

A. Sir?

Q. Do you know for a fact what James had in his back pocket?

A. Yes, I did.

Q. What was it?

A. It was a short .22 pistol.

Q. Was he able to get that pistol out?

A. No sir, he was not.

Q. Do you know if he got his hand to it or not?

A. No, sir, he didn't. I don't believe he did.

Q. What happened next?

A. Then the guy, the one that shot him, turned the gun on me and this girl screamed and then they ran.

The witness identified Farley as one of the two men who came up, but said that Farley did not do the shooting. There was a five foot fence behind the service station.

Mr. Taylor, the appellant here, cross-examined the witness, who admitted that he did not know Taylor and did not see him at the station on the night of the homicide.

A doctor, who examined Allen's body when it arrived at the emergency room at the hospital, testified that Allen had been shot with a shotgun loaded with birdshot and had bled to death from the main artery leading from the chest to the right arm. Taylor declined to cross-examine this witness.

The officer who apprehended and arrested Farley, after a chase at another address, was the next to testify. Taylor, quite correctly, declined to cross-examine him.

The next witness (outside the hearing of the jury) was Detective Miles. On June 26, 1975, he arrested our appellant, Ervin Taylor, pursuant to an arrest warrant and gave him his *Miranda* warnings. Taylor cross-examined Miles, eliciting the response that he did not resist arrest. Taylor attempted to get Detective Miles to say that he had been questioned on the way to police headquarters but Miles denied that. He also asked Miles if he had the arrest warrant in his possession when the arrest was made. Miles admitted that the warrant was at headquarters and was not produced until they arrived there.

Officer Rohlfs then testified, also out of the presence of the jury, that on June 26, 1975, at headquarters, he had given Taylor his *Miranda* warnings and Taylor said he understood them. Taylor made a statement, which was reduced to writing and then read to him. He read the statement and signed it. There were no promises and no duress. Taylor was offered, and drank a coca-cola during the interview. Taylor cross-examined Rohlfs, saying that he did not drink coca-colas. He asked about promises made him that day and the day before, which were denied.

The trial court informed Taylor of his right to testify and to challenge the propriety of the statement.

Taylor testified that the officer promised to help him out in court if he would give a statement, that he would "try to get me a lesser sentence".

The Court found that the statement had been voluntarily made. This holding has not been challenged.

Taylor's statement, as read to the jury by Detective Rohlfs, reflected the following facts:

Taylor is a black male, then nineteen years old. At about 7:30 or 8:00 o'clock on the fatal night, Taylor, along with seven named individuals, was shooting dice. He and three of the others were talking about how they did not have any money. Pear Davis [who did the actual shooting] suggested that they wait until dark and get the money at the TCR service station on Brown Avenue. Pear and another individual had two sawed off shotguns hidden near a path.

When we got up behind the station Pear told Rufus to walk up to the service station sign pole and wave his right hand when it was all right for us to go to the front. Rufus walked up to the pole like Pear told him to do and a few minutes later he waved his hand. Me and the other individual (apparently Farley, whose name was not allowed to be mentioned to the jury] asked Pear if we were ready, and he said yes. Pear jumped the fence first and then the other individual behind him. I stood there taking my glasses off so no one would recognize me. Before I could get ready to go over the fence, I heard a loud gunshot like one of the shotguns going off. I had already thought about not going ahead with it, but when I heard the gunshot I ran back through the woods and went home.

On cross-examination, Taylor asked the officer: "Did I act in any part of the robbery". The Court informed Taylor that he might ask the officer what "you did, but not whether you took part in the robbery or not", whereupon Taylor announced, "the defense rests", and, upon further inquiry from the Court, said he had no further questions.

Trial to the jury was then resumed.

Farley took the stand and testified.

After Farley's testimony, the following transpired:

THE COURT: Mr. Taylor, you may take the stand, if you wish, to present anything for the jury. And if the Court interrupts you, it will mean it's because you have gone outside the realm of what is admissible evidence. I will give you as much leeway, Mr. Smith, [Smith was the prosecutor] as I can. I will probably let him violate some rules that I wouldn't if he was represented by counsel. But, now, you may take the stand, and Mr. Smith will administer the oath to you and you may testify to whatever you care to say about this charge against you. So, you do not have to take the stand, but you may. You have that right if you want to, and to testify under oath. So, what is your election?

MR. TAYLOR: Your Honor, I wish not to take the stand.

THE COURT: You wish what?

MR. TAYLOR: I wish not to take the stand.

THE COURT: You do not want to take the stand?

MR. TAYLOR: No, sir.

THE COURT: All right, I want you to understand that you have a right to take the stand and to be sworn and testify under oath. Now, do you understand that?

MR. TAYLOR: Yes, sir.

THE COURT: And if you don't take the stand you are waiving your right, do you understand that?

MR. TAYLOR: Yes, sir.

THE COURT: You thoroughly understand that you have a right to take the stand, do you not?

MR. TAYLOR: Yes, sir.

At the close of the proof Mr. Taylor argued his case to the jury, but the argument does not appear in the official transcript, but he concluded by saying, "I rest my defense".

## II

### *The Habeas Corpus Proceedings*

The petition for federal habeas corpus alleged that "not comprehending how he could be guilty of murder if he did not actually shoot anyone, the petitioner begun to lose confidence in Mr. Cain prior to trial when he relayed an offer by the State to recommend a sixteen year sentence on a guilty plea to reduced charges".

It was further alleged that "after the trial had commenced and an all-white jury was selected (the petitioner is black), the petitioner totally lost confidence in his attorney".

The petition then recited *in haec verba* what happened when Taylor dismissed his counsel.

It was then alleged:

The trial judge never admonished the petitioner of the difficulties and dangers involved in representing himself; he never warned him that he would be held to rules and procedures that he might not understand. And he never attempted to explore and resolve the reasons that the petitioner did not want Mr. Cain to represent him.

The petitioner never waived his right, secured by the Due Process Clause of the Fourteenth Amendment and by the Sixth Amendment, to have the effective assistance of counsel for his defense. His confinement is therefore illegal.

Mr. Taylor represented himself at the state habeas corpus proceedings before the Superior Court of Butts County, Georgia. Since he was without legal counsel, the trial court questioned Taylor extensively in an effort to develop the basis for his petition. Taylor said that his appointed counsel came to see him twice prior to trial, that he talked about a plea bargain and no type of defense, "[S]o when I went to court, I told the Judge, Judge John Land, I would like to represent myself in the Court of law and he said like, according to your constitution (sic) you can do this". Taylor said that he thought his constitutional rights were being violated by being tried before twelve white jurors; that he "had an alibi and they [the State] had circumstantial evidence, hearsay". He said his alibi witnesses were his brother, Charles Taylor, and a fellow by the name of Rickey Stetson; that they were not called to testify because he did not know that he was going to be tried "that Monday morning". The alibi would have been that he was at home at the time of the murder. He further testified that Mr. Cain told him that his best alternative was to plead guilty. He did not decide to represent himself until after an all-white jury had been selected; Mr. Cain knew before the trial started that he, Taylor, did not want him to represent him. At this point, although Taylor had previously testified that Mr. Cain only came to see him twice, he said that he had told Mr. Cain several times in jail that he did not want him to represent him. He did not tell Mr. Cain anything about any alibi witnesses. He did not take the stand because he did not wish to be cross-examined by the district attorney. He felt that after the State had put on its evidence they had not proved him guilty. Taylor was a high school graduate.

Mr. William S. Cain testified that he was admitted to the Bar in 1948, and had handled hundreds of criminal cases. He had had five or six conferences with Mr. Taylor. He did negotiate with the district attorney for a possible plea. He thought that Taylor had a very difficult case, potentially a very dangerous case. His only defense was that Taylor did not do the actual shooting, that he had "chickened out" before the shot was fired. This, of course, was contradicted by Taylor's confession, and Mr. Cain had seen the district attorney's file. Taylor never at any time mentioned an alibi witness or advanced any other defense; he had signed a statement which had incriminated him. Cain had recommended a plea and a sentence of sixteen years, but was ready and prepared to try the case and put up any available defense. He was planning to challenge the lack of a speedy trial and was going to argue the question of criminal intent. When "Mr. Taylor got up on his own and asked the Court that I be relieved

and that he represent himself [I] was as shocked as I have ever been in twenty-eight years of practicing law".

There were at least six black persons on the original jury panel of thirty-three.

After the trial, he, Cain, had tried to talk to Mr. Taylor in the Muscogee County jail, told him he was sorry about what had happened, and that he better remember what his rights were on appeal. By that time, Mr. Taylor had developed an animosity toward Cain. Cain doubted that he listened to much of what he had said. Taylor had never told him that he planned to dismiss him as counsel, but "in the last three or four days prior to the trial there was something between Mr. Taylor and myself". He thought it was the recommendation that a plea be entered and a sentence of sixteen years be accepted. Cain simply could not get it across to Taylor that he could be tried and found guilty of murder under the facts of the case although he did not actually pull the gun. He had tried to explain that to Taylor at least five or six times "but he just could not comprehend that a man could be tried and convicted of murder when he had not done the actual killing". He had explained the defense of an alibi but the defendant did not name any alibi witnesses.

In the state habeas corpus proceedings, Mr. Taylor did not challenge the statement he had given the Columbus, Georgia officers which, of course, admitted he had gone with the others to rob the service station, knowing that they were armed with two sawed off shotguns; further admitting that while he was in the act of taking off his glasses as a means of frustrating identification, he heard the gun fire and he thereafter ran through the woods and went home.

The state court denied habeas corpus relief and the United States District Court, relying on the state court record, did likewise.

### III

#### The Constitutional Issues

There are three important aspects of this case which must be noted at the outset.

1. This is not a case in which a defendant was denied counsel, or had instituted long in advance of trial that he wished to defend himself as in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

2. This is a case in which the defendant, about to be jointly tried with another defendant, dismissed his court appointed counsel after a jury had been chosen and jeopardy had attached.

3. While Taylor had refused to follow the recommendation of his counsel for a plea bargain sentence of sixteen years, the dismissal of counsel in open court came without notice or warning.

It cannot be doubted that this habeas corpus appellant had been afforded the assistance of competent counsel as commanded by the Sixth and Fourteenth Amendments to the Constitution.

Neither can it be doubted that a state *may not* "constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense", *Faretta v. California, supra*, 422 U.S. at 807, 95 S.Ct. 2527.

Here, when Mr. Taylor made his unexpected announcement at a critical point in a trial which had begun with no objection from him, the trial court warned him that his counsel would represent him vigorously and without reservation; that counsel would be stood aside only if he insisted upon it; and concluded by telling him that it was not true that Mr. Cain's representation would not be in his best interest.

Now that a conviction has taken place and a sentence imposed, it is argued that the trial court should have warned Taylor of the difficulties and dangers involved in representing himself, that the trial court should have warned Taylor that he would be held to rules and procedures that he might not understand, and that the trial court should have attempted to explore and resolve the reasons for Taylor not wanting Cain to represent him.

■ We reject the third argument on its face. It is no part of a trial judge's duty to attempt to force unwanted counsel upon a defendant who has resolutely declared his purpose to dismiss that counsel. Furthermore, the trial court did what it could to disabuse the defendant's mind as to the loyalty of his counsel.

Neither should we ignore the fact that had the court stopped to appoint other counsel and give him time to prepare for trial the rights of the co-defendant would have been involved. In any event, Taylor did not ask for the appointment of new counsel.

The case simply boils down to the issue of whether under the particular facts of this case the State, through its trial court, violated Taylor's constitutional rights by honoring his deliberate request that his counsel be taken out of the case and that he be allowed to represent himself.

This case has been briefed and orally argued on traditional and well established rules pertaining to the waiver of counsel. We have already pointed out, *ante,* that competent counsel had been afforded Taylor and that counsel had traveled with him right up through the selection of the jury. Counsel was not waived; counsel was dismissed. It was done in the face of a very clear warning from the trial judge that the action should not be taken.

None of counsel for either side in this appeal has mentioned the language in *Faretta v. California,* 422 U.S. at 819, 95 S.Ct. at 2533, n. 15,

> Our concern is with an independent right of self-representation. We do not suggest that this right arises mechanically from a defendant's power to waive the right to the assistance of counsel. *See, supra,* at 2530–2531. On the contrary, the right must be independently found in the structure and history of the constitutional text.

*Faretta* was not dealing with the dismissal of counsel in the midst of a trial, but we have considered its concluding language, 95 S.Ct. at 2541, to the effect that in order competently and intelligently to choose self-representation, a defendant should be made aware of the dangers and disadvantages of self-representation so that the record will establish that " 'he knows what he is doing and his choice is made with eyes wide open' ".

We have also considered the immediately following contents of the *Faretta* opinion in which it was pointed out that:

(1) Weeks before trial Faretta had clearly and unequivocally declared that he wanted to represent himself [whereas, Taylor waited until after the jury was selected to dismiss his counsel, who had been laboring with him for sometime];

(2) Faretta was literate, competent, and understanding, and he was voluntarily exercising his informed free will [Faretta had a high school education, as did Taylor];

(3) The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel [which was done by the Georgia trial judge];

(4) Faretta was warned that he would be required to follow all the ground rules of trial procedure [the Georgia trial judge gave no such warning, but ruled, instead, that he would give Taylor as much leeway as he could; that he would probably allow Taylor to violate some rules that would not be allowed if he were represented by counsel];

(5) Faretta's technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

It may be of some significance, also, that in his dissenting opinion Mr. Justice Blackmun pointed out that *Faretta* was not a case "where distrust, animosity, or other personal differences between the accused and his would-be counsel have rendered effective representation unlikely or impossible" [citations omitted].

## IV

### Fifth Circuit Precedent

As far as we can find, our only *post Faretta* decision is *Chapman v. United States,* 5 Cir., 1977, 553 F.2d 886. It was there held that a demand for self-representation must be honored even on the day scheduled for trial if it is made before the jury is selected and if there is no affirmative showing that it was a tactic to secure delay. The *Chapman* opinion was careful to point out, however, that the Court did not need to decide (and therefore did not decide) how to treat one's right to defend *pro se* when it is raised during trial, 553 F.2d at 894. Here, since the Georgia trial court honored Taylor's request, we need not decide whether a trial court is compelled invariably to honor such a request after the trial jury has been selected.[3]

## V

### Conclusion

■ Under the facts of this case, we hold that the defendant was not deprived of his constitutional rights when the Georgia trial court honored his request to conduct his own defense.

In so doing, we need not decide whether a defendant's dismissal of counsel in open court after a trial has begun must be evaluated by strict waiver analysis where counsel has been provided, his competency is not challenged, he is thoroughly familiar with the facts and applicable law, he has fully discussed these matters with his client, he is present, and he is ready to proceed with the only defenses remotely available.

For one thing, we think that the warnings set forth in *Faretta* as advisable for people who insist *prior to trial* on representing themselves were substantially complied with in this mid-trial case, see page 1290, *ante.* Moreover, *Faretta* did not indicate that a failure literally to comply with every standard there announced will constitute prima facie grounds for setting aside a conviction.

There are further reasons for not upsetting this conviction on constitutional grounds:

1. The record shows that Taylor's counsel had fully explained to him the elements which could lead to his conviction for murder, which were that he had agreed to participate in a robbery in which the murder was committed and in which, by his own confession, he was getting ready to participate when the fatal shot was fired, after which he fled the scene. The record clearly shows that the defendant would not accept this as the law and this was a major reason for his precipitately getting rid of his lawyer, over the advice of the trial judge.

2. The record shows that Taylor got a fair trial. No evidence introduced against him could have been excluded even if Taylor had been represented by counsel.

3. The record reflects that prior to trial Taylor had been well informed of his various rights at trial. For example:

(a) Taylor declined to cross-examine witnesses who had given no testimony damaging to him;

(b) He knew that for an admission against interest (or confession) to be admissible it had to be voluntary. He cross-examined the officer on this subject and offered his own testimony as to the promises of leniency allegedly offered him in return for a confession;

(c) Taylor declined to take the witness stand in his own behalf, stating at the habeas corpus hearing that he did so because he did not want to be cross-examined by the district attorney; and

(d) He felt capable of arguing his case to the jury, and did argue it.

Finally, the trial court announced in Taylor's presence that it would relax the usual rules and would give Taylor as much lee-

---

**3.** The Fourth Circuit has held that a defendant does not have an absolute right to dismiss counsel and conduct his own defense after trial has commenced, *United States v. Dunlap,* 4 Cir., 1978, 577 F.2d 867. The Supreme Court denied certiorari, —— U.S. ——, 99 S.Ct. 174, 58 L.Ed.2d 166 (1978).

way "as I can" and would probably allow him to violate some rules in instances which would not be permitted if he were represented by counsel. The trial court record reflects that the Court scrupulously adhered to this policy.

The trial court carefully informed Taylor of all his rights as the trial progressed.

The burden in a habeas corpus proceeding was on the petitioner to demonstrate that he was unaware of the disadvantages to be encountered by lack of counsel. In the state habeas corpus proceedings Taylor made no assertion that he was unaware of these considerations. The record refutes such an assertion, had it been made.

The denial of habeas corpus relief for Ervin G. Taylor is

AFFIRMED.

TJOFLAT, Circuit Judge, dissenting:

I dissent from the result reached by the majority in this case because I do not believe that, on the record before us, we can conclude that petitioner Ervin G. Taylor intelligently waived his sixth amendment right to assistance of counsel.

*Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), instructs that before a criminal defendant can represent himself he must knowingly and intelligently forego the benefits of representation by counsel. *Faretta* commands that the knowing and intelligent waiver [1] must be evaluated under the test of *Johnson v.*

*Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), which states:

> A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.
>
> .   .   .   .
>
> .  .  .   While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.

*Id.* at 464–65, 58 S.Ct. at 1023.

> To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances
> .   .  . .

*Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948) (plurality opinion of Black, J.). As *Faretta* concludes,

---

1. The majority states that in this case counsel was not waived, but rather was dismissed. *Ante* at 1290. This is at best a semantic distinction. The fact remains that Taylor proceeded to trial without counsel; in doing so, he either *waived* the right to the presence of counsel or he did not.

In all *Faretta*-type cases, including *Faretta* itself, previously retained or appointed counsel has been dismissed by a defendant. *E. g., United States v. King,* 582 F.2d 888 (4th Cir. 1978); *United States v. Jones,* 580 F.2d 785 (5th Cir. 1978); *Ford v. Wainwright,* 526 F.2d 919 (5th Cir. 1976). The *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), standard of knowing and intelligent waiver of the right to counsel called for in *Faretta* clearly applies when, as here, counsel is dismissed and

a defendant proceeds to represent himself in a criminal trial.

The majority cites, *ante* at 1290, to note 15 of *Faretta* as having some special significance, although it does not explain why it is important here. In fact, note 15 of *Faretta* points out that two different, but closely intertwined, sixth amendment issues are involved in cases such as *Faretta* or the one now before us: (1) waiver of the right to adequate representation by counsel, and (2) exercise of the independent right to self-representation. When a defendant chooses to exercise his right to proceed pro se, he necessarily chooses to waive his right to counsel. Hence, the right recognized in *Faretta* entails the application of the *Johnson v. Zerbst* standard of waiver.

Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."

422 U.S. at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). *See, e. g., United States v. King,* 582 F.2d 888, 890 (4th Cir. 1978); *United States v. Gillings,* 568 F.2d 1307, 1308–09 (9th Cir.), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2267, 56 L.Ed.2d 760 (1978); *Chapman v. United States,* 553 F.2d 886, 892 (5th Cir. 1977); *Ford v. Wainwright,* 526 F.2d 919, 921–22 (5th Cir. 1976).

Applying the standards of *Faretta* to the facts of this case, I cannot agree that the colloquy between Taylor and the trial court indicates that Taylor made a knowing and intelligent waiver of his right to counsel. In that colloquy, *ante* at 1285, after Taylor stated he did not wish his attorney to represent him further, the court raised the issue of proceeding pro se; no mention was made of the possibility that new counsel might be appointed. The court praised the competence of Taylor's attorney (Cain, the public defender), heard Taylor state that he wanted Cain discharged because "it's like [Cain] just might not be in my best favor," *id.* at 1285, and offered to allow Taylor to proceed pro se. The court chose not to ask Taylor why he mistrusted Cain (had it done so, it might have disabused Taylor of the main cause for his mistrust, his failure to comprehend the felony-murder rule). But more importantly, the court never pointed out to Taylor the complexities of trying a criminal case or the dangers of representing oneself in a complicated murder trial involving the felony-murder rule, with a co-defendant (Farley), whose interests were in conflict with those of Taylor, represented by counsel.[2] In my view,

the court did not carry out that "penetrating and comprehensive examination" called for by *Von Moltke v. Gillies,* 332 U.S. at 724, 68 S.Ct. at 323, and did not make Taylor "aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California,* 422 U.S. at 835, 95 S.Ct. at 2541.

The majority compares Taylor with the petitioner in *Faretta* and seems to conclude that Taylor made as knowing and intelligent a decision to proceed without counsel as did Faretta. *See id.* at 835–36, 95 S.Ct. at 2541. I cannot agree. Unlike Faretta, who informed the trial court weeks before trial that he wished to represent himself and demonstrated considerable study of procedural and evidentiary law, *id.* at 808 n. 3, 95 S.Ct. at 2528, Taylor announced his intention only after trial had already commenced and exhibited no particular procedural or evidentiary knowledge. In fact, on several occasions during the trial, when the prosecutor's objections to Taylor's style of examining witnesses were sustained, Taylor simply abandoned his questioning. Taylor, like Faretta, was to some degree literate, but the record does not indicate that he was voluntarily exercising his *informed* free will to be tried without counsel. Unlike Faretta, Taylor was *not* informed by the trial court that he "would be required to follow all the 'ground rules' of trial procedure." *Id.* at 836, 95 S.Ct. at 2541. I cannot agree that the court's subsequent decision to give Taylor greater latitude in the conduct of his defense adequately substituted for the direct and detailed warning Faretta received before he finally decided to represent himself. *Id.* at 808 n. 2, 95 S.Ct. at 2527.

In Part V (Conclusion) of its opinion, *ante* at 1291–1292, the majority initially declines to decide whether a strict waiver analysis should be applied to a criminal defendant who, after jeopardy has attached, dismisses his counsel and decides to appear pro se. Under *Faretta* and its prog-

2. Before trial, Cain, then representing all the defendants, had moved the court to appoint separate counsel for each defendant, and the motion was granted.

eny a *Johnson v. Zerbst* analysis should be applied regardless of when a defendant articulates his desire to dismiss his attorney and represent himself. To be sure, the trial judge's task of determining whether a defendant is making a knowing waiver of counsel may be more sensitive and difficult once jeopardy has attached, but this must not lead us to apply a different, and lower, standard, as I am convinced the majority has done. *See United States v. Jones,* 580 F.2d 785, 787–88 (5th Cir. 1978).

The majority states that the trial court substantially complied with *Faretta.* As I have already stated, I do not feel that the interchange between the court and Taylor sufficed fully to apprise Taylor of the magnitude of his decision. The majority then maintains that Taylor was not prejudiced by representing himself, as if a failure to comply with *Faretta* can be excused if no prejudice results. *Holloway v. Arkansas,* 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978), however, holds that the sixth amendment right to counsel is so fundamental to a fair trial that its violation can *never* be treated as harmless error. Thus, Taylor need not show that he was prejudiced by the lack of counsel; prejudice, or the lack of it, is irrelevant. At any event, in my view it is clear that Taylor was prejudiced. A reading of the trial transcript discloses occasions when he would have been far better served had he been represented by competent counsel. Had Taylor appealed his conviction, which competent counsel may well have advised, his conviction for attempted armed robbery would have been reversed just like that of his co-defendant, Farley, *ante* at 1284 n. 2. *See Farley v. State,* 238 Ga. 181, 231 S.E.2d 761 (1977). As a result, he would not be serving consecutive sentences.

In concluding that the state trial judge committed constitutional error in this case, I have been guided by several other decisions dealing with pro se representation and waiver of the right to counsel. In *Fillippini v. Ristaino,* 585 F.2d 1163 (1st Cir. 1978), the district court denied habeas corpus relief to a state prisoner who waived counsel after several extended discussions with the trial

judge regarding the need for representation. During these conferences the judge offered to appoint new counsel. The petitioner acknowledged the importance of counsel in defending one charged with armed robbery, as petitioner was, but repeatedly refused the court's proffer of assistance. He had been represented by counsel in a prior armed robbery prosecution. Unlike Taylor, Fillippini was fairly and fully warned of the risks of his proposed course of action, had prior experience with the offense for which he was tried, and obviously made his decision to represent himself "with his eyes open." Similarly, in *United States v. King,* 582 F.2d 888 (4th Cir. 1978), the defendant waived counsel after the trial judge "engaged in a lengthy colloquy with [him] in an attempt to dissuade him from self-representation. He warned King of the seriousness of the charges, the potential penalty, the advantages of legal training and the likelihood of complex legal issues arising at trial." *Id.* at 889. The Fourth Circuit held that this explanation was enough, when coupled with the defendant's responses, to indicate an "eyes open" waiver. In *United States v. Jones,* 580 F.2d 785 (5th Cir. 1978), "[b]efore granting appellant's request the trial court conducted a lengthy colloquy with him, recommending that he continue his representation by counsel. The court found for the record that Jones was in possession of his faculties, literate and reasonably articulate." *Id.* at 788. Consequently, the defendant's waiver of counsel was found to be knowing and intelligent. *United States v. Gillings,* 568 F.2d 1307 (9th Cir.), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2267, 56 L.Ed.2d 760 (1978), upheld one co-defendant's waiver after "an extended discussion [with the court] in which [this defendant] played a major role," *id.* at 1309, but reversed the conviction of the other defendant because the record did not indicate a knowing and intelligent waiver. *Id.* Finally, this court in *Chapman v. United States,* 553 F.2d 886 (5th Cir. 1977), held that when a defendant expresses the desire to waive counsel and proceed pro se "a trial judge should engage in a dia-

logue with such a defendant, explaining to him the consequences of defending pro se." *Id.* at 892. We also observed in *Chapman* that the demand to proceed pro se should be stated unequivocally. *Id.* at 892–93. In the light of these decisions, I do not see how we can say that Taylor's conviction can withstand constitutional scrutiny. *See Badger v. Cardwell,* 587 F.2d 968, 972 n. 3 (9th Cir. 1978).

In summary, Taylor was not adequately made aware by the trial court of the problems and disadvantages inherent in proceeding pro se. It was the trial judge, not the defendant, who initiated the idea of going forward without counsel. Once the judge indicated that the defendant would remain without counsel if he insisted on the discharge of the public defender, no effort was made to undertake a penetrating and comprehensive examination to determine whether the right to counsel was being waived. I find nothing in this record that indicates a knowing and intelligent relinquishment of that right. I respectfully dissent.