**In re TEXACO INC., Texaco Capital Inc., Texaco Capital N.V., Reorganized Debtors.**

**Bankruptcy Nos. 87 B 20142, 87 B 20143 and 87 B 20144.**

United States Bankruptcy Court, S.D. New York.

Aug. 22, 1988.

Weil, Gotshal & Manges, New York City, for debtors.

William J. Guste, Jr., Atty. Gen. of the State of La., Baton Rouge, La., Mary Ellen Leeper, Asst. Atty. Gen. of the State of La., Baton Rouge, La., Ernest R. Eldred, George L. Clauer, III, Sp. Asst. Attys. Gen., Eldred, Clauer and Davis, Baton Rouge, La., for the State of La.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for Louisiana Land and Exploration Co.

David L. Landry, Thibodaux, La., for Lafourche Parish School Bd.

DECISION ON MOTIONS OF THE STATE OF LOUISIANA, LAFOURCHE PARISH SCHOOL BOARD AND THE LOUISIANA LAND AND EXPLORATION COMPANY FOR CHANGE OF VENUE

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The State of Louisiana (the "State") and various other parties to Louisiana oil and gas agreements with the debtor, Texaco Inc., have moved to transfer the venue of Texaco's motion for preservation of its rights under the agreements. In addition to the State of Louisiana, those parties seeking a transfer of venue to a federal courthouse in Louisiana are the Lafourche Parish School Board and the Louisiana Land and Exploration Company ("the Louisiana parties").

### FINDINGS OF FACT

1. On April 12, 1987, Texaco Inc. and its two financial subsidiary corporations, Texaco Capital Inc. and Texaco Capital N.V., filed Chapter 11 petitions under the Bankruptcy Code with this court and continued to operate their businesses as debtors in possession in accordance with 11 U.S.C. §§ 1107(a) and 1108.

2. By order dated July 10, 1987 (the "Procedure Order"), this court established a procedure for Texaco Inc. ("Texaco") to follow to assume or otherwise preserve its oil and gas agreements, including oil and gas leases, subleases, mineral servitudes and operating agreements.

3. Pursuant to an order dated September 15, 1987, Texaco requested an order approving its assumption of oil and gas agreements with the State, or alternatively determining that such oil and gas agreements are not subject to 11 U.S.C. § 365 because they are estates in real property. Similar motions were filed by Texaco with respect to oil and gas agreements in Louisiana with the other parties.

4. In October of 1987, the State and Lafourche Parish filed motions requesting an order transferring venue of the Assumption Motion to the United States Bankruptcy Court for the Middle District of Louisiana, where the State had pending against Texaco a prepetition Declaratory Judgment Action for cancellation of the leases in question because of Texaco's alleged default with respect to 44 leases to the extent of approximately $387 million. Lafourche Parish School Board sought an order transferring venue of its motion to the United States Bankruptcy Court for the Eastern District of Louisiana.

5. Pursuant to a Peremptory Objection dated October 14, 1987, the State requested an order denying Texaco's assumption motion. The Objections contained a detailed listing of the State's conclusions and specifications as to various alleged defaults by Texaco, including claims for the underpayment of royalties.

6. On October 15, 1987, the State moved in the United States District Court for the Southern District of New York for an order pursuant to 28 U.S.C. § 157(d) revoking the reference of Texaco's assumption motion with respect to the oil and gas agreements with the State or finding them not subject to 11 U.S.C. § 365.

7. On November 6, 1987, Lafourche Parish made a similar motion in the United States District Court for the Southern District of New York to revoke the reference.

8. Both the State and Lafourche Parish raised certain threshold defenses based on state law, which if successful, would require a denial of Texaco's assumption motion. It was asserted that under Louisiana law, an oil and gas lease cannot be assigned or assumed without the approval of the Louisiana Mineral Board, which will not approve Texaco's assumption of the oil and gas agreements. Therefore, it was argued that applicable local law excuses the State and Lafourche Parish from allowing Texaco to continue to extract oil and gas from the leases in question.

9. Pursuant to an order of the United States District Court for the Southern District of New York, Judge Gerard L. Goettel, referred the withdrawal motions to this court for the purpose of making recommendations with respect to the disposition of the motions. On January 14, 1988 this court submitted its recommendations and concluded that there should be no discretionary withdrawal of the reference because the application of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 et seq., which is a non-title 11 federal law, did not require a substantial and material interpretation in the resolution of the issues. In re Texaco, 84 B.R. 911 (S.D.N.Y.1988). Judge Goettel adopted this court's recommendations and concluded that the issues involved did not require a significant interpretation "of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce" as expressed in 28 U.S.C. § 157(d). In re Texaco, 84 B.R. 911 (S.D.N.Y.1988).

10. On March 15, 1988, the State filed its proof of claim against the Texaco estate requesting relief including: (1) at least $387 million, based on alleged royalty underpayments, including interest; (2) various statutory penalties, including double royalties with respect to the $387 million alleged royalty underpayment; (3) an audit of Texaco's prior production and royalty payment records; (4) termination of Texaco's interest in at least 44 leases; (5) attorney's fees; and (6) interest.

11. By proof of claim numbers 3648, 3774 and 4082, Lafourche Parish filed

claims against Texaco in the amounts of $18 million, $2 million and $1.8 million, respectively, based on alleged royalty underpayments as well as other matters.

12. On March 15, 1988, The Louisiana Land and Exploration Company filed its proof of claim in the total sum of $500 million arising out of Texaco's alleged obligations under mineral leaseholds in Louisiana.

13. On March 23, 1988, this court entered an order confirming the Second Amended Joint Plan of Reorganization submitted by Texaco and Pennzoil Company.

14. On April 7, 1988, the debtors paid $3 billion to Pennzoil in full settlement of its claim. Additionally, the debtors substantially consummated their reorganizational plan by paying in cash the full amount of all allowed unsecured claims, together with post-petition interest. In accordance with 11 U.S.C. § 1141(b) the confirmation order vested all of the property of the estate in the debtors.

15. In June of 1988, Texaco objected to the proofs of claim filed by the State, Lafourche Parish and The Louisiana Land and Exploration Company.

16. By motion dated June 17, 1988, the State requested this court to issue an order changing venue of Texaco's objection motion to the United States Bankruptcy Court for the Middle District of Louisiana and consolidating the assumption venue motion and the claim venue motion.

17. By motion dated July 8, 1988, Lafourche Parish requested an order transferring the venue of Texaco's claim objection motion to the Bankruptcy Court for the Eastern District of Louisiana and for an order consolidating the Venue Motion and the claim venue motion.

18. By stipulations dated July 8 and 13, 1988, Texaco and Lafourche Parish agreed to consolidate the hearings on the venue motion and the claim venue motion, and to consolidate the hearing on the venue motions of Lafourche Parish with the hearing on venue motions filed by the State.

19. Pursuant to a motion dated July 27, 1988, the Louisiana Land and Exploration Company also sought a transfer of venue with respect to Texaco's objections to its claim to the United States District Court for the Middle District of Louisiana.

20. It is clear from the evidence at the hearing of these venue motions that all of Texaco's records concerning Texaco-operated wells in Louisiana are located either in the Texaco offices in Louisiana or in its office building in Houston, Texas. Records pertaining to the metering of wells are located in Texaco's district offices located in Louisiana. The originals of all gas sales contracts and any amendments involving Texaco's customers on its Louisiana Industrial Pipeline ("LIS") are located in New Orleans, Louisiana, where Texaco maintains an office building. Documents pertaining to the volumes of gas transported through the pipelines and delivered to Texaco's industrial customers are located in New Orleans.

21. The witnesses for the State and the other Louisiana parties, including experts, accountants, auditors, geologists and employees of Texaco's industrial customers served by LIS are all located in Louisiana.

22. Texaco's witnesses as to the calculation of its royalty payments under the Louisiana gas and oil agreements are located either in Louisiana or Texas.

23. If it were not for the commencement of the Chapter 11 cases, the disputes concerning Texaco's royalty obligations to the Louisiana parties, would have been resolved by courts in Louisiana. The bulk of the Chapter 11 administration is now history. Texaco is no longer a debtor in possession. Pursuant to 11 U.S.C. § 1141(b) Texaco has been revested with its property as a result of the order of confirmation. All undisputed claims have been paid in full. Texaco is now free to get on with its business, without further supervision by the bankruptcy court. The jurisidiction by the bankruptcy court over Texaco's business operations has been reduced to resolving those disputed claims which Texaco has not yet settled or which Texaco has agreed to defend in ongoing litigation pursuant to stipulations waiving the automatic stay.

## DISCUSSION

The Louisiana parties contend that the issues raised by Texaco's objection to their claims for underpayment of oil and gas royalties and for cancellation of their agreements with Texaco should be conducted in the federal courts of Louisiana in the interest of judicial economy and for the convenience of all parties. There is no question that Texaco's obligations to the Louisiana parties under the oil and gas agreements with respect to Louisiana wells must be determined by Louisiana law. This court stated in connection with the pre-confirmation motion for relief from the stay and abstention filed by Plaquimines Parish in *In re Texaco*, 77 B.R. 433 (Bankr. S.D.N.Y.1987), that it is a fundamental principal of bankruptcy law that property interests are created and defined by state law and that bankruptcy courts should look to state law for determination of property rights in the assets of debtors' estates,. citing *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

The dispute between the parties with respect to Texaco's oil and gas royalty payments predates the filing of the Chapter 11 cases, which only interrupted Texaco's ongoing clashes with the Louisiana parties as to Texaco's obligation to them for royalties. In 1980 Louisiana asserted a claim against Texaco for underpayment of royalties. The action was compromised in 1981 with Texaco paying the State $28 million and the parties agreeing that Texaco would pay royalties based on the contract prices whenever gas came from an existing well and that Texaco would pay royalties based on the maximum prices allowed under the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.*, whenever gas came from new wells. One of the arguments made by the State is that as old existing contracts expired a proportionate share of the gas was available for sale under a rollover contract and that Texaco should have sold this gas in accordance with the higher rollover rate. Instead, as argued by the State, Texaco formed two subsidiary corporations, Bridgeline Gas Distribution Company and Riverway Gas Pipeline and that these subsidiaries entered into contracts with some of the former customers to supply these customers with gas. The State also contends that there was a commingling of gas in the same pipelines as other gas that was sold at higher prices so that the State's gas should be deemed sold at the higher prices. The other Louisiana parties also make similar arguments. The Texaco dispute with the State dates back to 1953 when Texaco constructed the Louisiana Industrial Gas Pipeline System ("LIS") for the purpose of delivering gas produced in Southern Louisiana to potential and existing industrial users along the Mississippi River. LIS is an intrastate pipeline delivering gas only within the State.

LIS gas comes from numerous sources other than under Texaco's leases with the State. The gas from all sources is commingled. Therefore, it is impossible to identify the source of gas for a specific consumer. Texaco's volume allocation system allocates all LIS dispositions back to the various sources on a proportionate basis. The State maintains that in determining the weighted average price to pay State royalties, Texaco arbitrarily assigned production allocated to the State's old wells to the remaining old low price contracts. Because of this allocation, the State believes that Texaco underpaid royalties to the State.

In determining underpaid royalties claimed, the State used the market value on all production attributable to the non-compromise leases up to the time the Natural Gas Policy Act (NGPA) became effective in November of 1978. The State maintains that the NGPA is an influencing factor in determining the market price, or what a gas purchaser would pay for natural gas in the open market. The NGPA sets a ceiling for natural gas but does not establish prices.

The State contends that if the market price on the date of the enactment of the NGPA was greater than the Section 102 price for new gas under NGPA, then the market price would be frozen until such time as the price could escalate as provided under Section 102. Thereafter, the State would claim the Section 102 price for peri-

ods after November, 1978. The State claims that under this analysis Texaco has underpaid the State on the non-compromise leases, the sum of $283,871,355 in principal together with interest.

The State has also made an alternative computation based upon Texaco's position. On this basis, all gas that was flowing on the date of the enactment of the NGPA would be considered as being dedicated to the fulfillment of the existing industrial contracts which Texaco had. All of the old gas from these wells would thereafter be limited under the provisions of Section 105 of the NGPA to the contract price until such time as the contract terminated by its own terms. Thereafter, any gas which had been subject to a terminated contract would be available for pricing under Section 106 of the NGPA, which provision governs a rollover contract. Under the rollover provisions of Section 106 Texaco would be limited in the amount it could sell the gas to its industrial customers. If the prior contract was for less than $1.00 per unit then Texaco could only sell it under a new contract of $1.00 per unit plus escalation as provided under the NGPA. If the old contract was more than $1.00 per unit on the date of the expiration of the contract, then Texaco could sell it for the maximum price provided under the expired contract plus an escalation factor. These rollover limitations do not apply to the State's royalty share. The maximum lawful price under a rollover contract would go to the Section 102 price (new gas) which would be substantially higher than the expired contract prices or the $1.00 plus escalation. The Section 106 gas (rollover contracts) was deregulated on January 1, 1985. Therefore, Texaco was required to pay royalties after January 1, 1985 at the market value of the Section 106 gas. On this basis, the State claims that Texaco owes a minimum of $40,073,094 including interest for the period between January 1, 1979 through December, 1985. For periods between January 1, 1970 to December 31, 1978, the State calculates that Texaco has underpaid royalties in the sum of $163,586,247, including interest and using market value prices.

A summary of the State's position as to its claim for alleged royalty underpayments is set forth in this court's recommendations with respect to the reference withdrawal motion. *In re Texaco,* 84 B.R. 911, 17 B.C.D. 8 (S.D.N.Y.1987).

The other Louisiana parties also argue in similar fashion that Texaco has underpaid royalties to them for gas extracted from wells in Louisiana which was then commingled in Texaco's Louisiana Industrial Gas Pipeline System for delivery to Texaco's industrial customers in Louisiana. The Louisiana parties contend that Texaco paid royalties on a value that was less than market value. In an earlier dispute with the Louisiana Land and Exploration Company Texaco defended its position in the Louisiana state court on the ground that the NGPA precluded Texaco from paying royalties on the true value of the gas sold to its industrial customers in Louisiana and that it elected to deliver its gas to contract purchasers in lieu of deliveries to other purchasers. A partial summary judgment awarded in favor of The Louisiana Land and Exploration Company was reversed by the Supreme Court of Louisiana. *The Louisiana Land and Exploration Company v. Texaco,* 491 So.2d 363 (1986), *rehearing denied,* Sept. 4, 1986, *cert. denied,* — U.S. ——, 107 S.Ct. 3239, 97 L.Ed.2d 744 (1987).

In light of the prepetition litigation in Louisiana between Texaco and the Louisiana Oil and gas licensors with regard to the ongoing dispute as to Texaco's royalty payments for gas extracted from wells in Louisiana for sale to Texaco's industrial customers in that state who are serviced by Texaco's Louisiana Industrial Gas Pipeline System, the Louisiana parties would like to have these issues resolved in Louisiana for the convenience of all parties.

### Venue Considerations

Generally, in all cases under title 11, the bankruptcy court must centralize the administration of the debtor's estate in order to carry out the dominant principle that there must be an equality of distribution among creditors. Pursuant to this policy an automatic stay is imposed under 11 U.S.

C. § 362 to protect the estate from dismemberment by those creditors who might otherwise rush to the courthouse to satisfy their claims. "The purpose of the automatic stay is to protect creditors in a manner consistent with the bankruptcy goal of equal treatment." *Hunt v. Bankers Trust Company,* 799 F.2d 1060, 1069 (5th Cir. 1986). One of the factors supporting the continuance of the automatic stay as expressed in 11 U.S.C. § 362(d)(2)(B), is that the debtor's property may be necessary to an effective reorganization. Similarly, the trustee or a debtor in possession is empowered to recover a voidable preference, if in accordance with 11 U.S.C. § 547(b)(5)(A), such preferential treatment enables the creditor to receive more than what would be received in a Chapter 7 liquidation. Moreover, unauthorized post-petition transfers of the debtor's property may be recaptured under 11 U.S.C. § 549 in order to satisfy the goal of equal treatment.

In the *Texaco* cases, the need for centralization of all disputes has been served. An effective reorganization has already been achieved and all past due undisputed general claims have been paid in full and with post-petition interest. The satisfied general creditors are no longer concerned that Texaco's disputed claims might affect the size of their distribution. Therefore, the factors that existed in favor of centralized administration in the *Texaco* cases before substantial consummation of the reorganization plan no longer apply with equal vigor. The decisions favoring centralized administration in preconfirmation cases, where there has been no distribution to undisputed general claimants, are distinguishable from the instant cases where Texaco has been revested with all of its property and is no longer a debtor in possession and where all undisputed past due claims have been fully paid in cash, together with post-petition interest. There is no longer any overriding reason why the rights of the disputed claim holders as to the appropriate venue for litigating their disputes with Texaco should be any less now than before the commencement of Texaco's Chapter 11 cases when those disputes were pending in the courts in Louisiana. Indeed, subsequent to confirmation Texaco entered into numerous stipulations with creditors in pending prepetition lawsuits providing that those judicial tribunals would decide such claims and any amounts owing would be paid "in accordance with final orders of the same administrative or judicial tribunals that would determine such claims if the Texaco Chapter 11 case had not been commenced."

█ The governing provision in bankruptcy cases for venue changes is 28 U.S.C. § 1412 which provides:

A district court may transfer a case *or proceeding* under title 11 to a district court for another district, in the interest of justice or *for the convenience of the parties.*

(emphasis added). A motion for a change of venue is a core matter under 28 U.S.C. § 157(b)(2)(A) which may be heard by the bankruptcy court pursuant to the district court's order of reference under 28 U.S.C. § 157(a). *In re Ofia Realty Corp.,* 74 B.R. 574, 576 (Bankr.S.D.N.Y.1987); *In re Waits,* 70 B.R. 591, 594 (Bankr.S.D.N.Y. 1987).

The criteria which the courts have fashioned, generally before distribution to creditors in Chapter 7 cases and before substantial consummation of Chapter 11 cases, in determining whether or not to exercise the discretionary authority to transfer venue, are as follows:

(1) The proximity to the court of:
  (a) creditors
  (b) debtors
  (c) assets
  (d) witnesses
(2) The relative economic harm to debtors and creditors caused by a transfer.
(3) The economics of administering the estate.
(4) The effect on the parties and their willingness or ability to participate in the case or in adversary proceedings.
(5) The availability of compulsory process and the cost associated with the attendance of unwilling witnesses.

*Commonwealth of Puerto Rico v. Commonwealth Oil Refining Company, Inc.*

*(In re Commonwealth Oil Refining Company, Inc.)*, 596 F.2d 1239, 1247 (5th Cir. 1979), *cert. denied* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980); *In re Old Delmar Corp.*, 45 B.R. 883, 884 (S.D.N.Y. 1985); *Landmark Capital Company v. North Central Development Company (In re Landmark Capital Co.)*, 20 B.R. 220, 223–24 (S.D.N.Y.1982); *Hadar Leasing International Co., Inc. v. D.H. Overmyer Telecasting Company, Inc., (In re Hadar Leasing International Co., Inc.)*, 14 B.R. 819, 820 (S.D.N.Y.1981); *In re Ofia Realty Corp.*, 74 B.R. 574, 575, 576 (Bankr.S.D.N.Y.1987); *In re Waits*, 70 B.R. 591, 594–595 (Bankr.S.D.N.Y.1987); *In re Developers of Caguas, Inc.*, 26 B.R. 977, 980 (Bankr.E.D.N.Y.1983); *In re Dock of the Bay, Inc.*, 24 B.R. 811, 815–16 (Bankr.E.D.N.Y.1982); *In re Boca Development Associates*, 18 B.R. 648, 652 (Bankr.S.D.N.Y.1982); *General Electric Pension Trust v. BSJ Tower Associates (In re BSJ Tower Associates)*, 11 B.R. 449, 450 (Bankr.S.D.N.Y.1981).

■ In the instant case the gas licensors are all located in Louisiana. The license agreements and all of the records with regard to royalty payments and gas extracted from wells in Louisiana and sold to Texaco's customers in Louisiana through its LIS pipeline are located either in Louisiana or in Texaco's regional offices in Louisiana and Texas. The licensor's audit records and documents pertaining to the disputes are located in Louisiana. Manifestly, a federal court in Louisiana would satisfy the proximity factor for the licensor creditors, the debtor's regional representatives, the assets in question and the witnesses who will be required to testify as to the merits of the dispute, which is governed by Louisiana law.

There would be no economic harm to Texaco or the Louisiana parties caused by a transfer to a federal court in Louisiana because Texaco's office building in New Orleans is only a few blocks away from a federal courthouse. The economics of administering the Texaco estate is a minor issue because Texaco is no longer a debtor in possession and all of the past due general claims of the undisputed creditors have been paid in full. The ability of the parties to participate in the proceedings in Louisiana will not be affected, in light of the fact that they all maintain business offices in that state, where litigation regarding the disputes in question had commenced before the filing of the Chapter 11 cases. Texaco and the Louisiana parties were represented by attorneys admitted to practice in Louisiana. The availability of compulsory process and the cost associated with the attendance of unwilling witnesses are factors which also weigh in favor of a Louisiana venue, where most of the witnesses required by all parties are located.

The only factor directed towards a continuance of the litigation in this court is that Texaco's Chapter 11 cases were filed here because its principal office is located in Westchester County, New York. The post-confirmation disputes concerning Texaco's oil and gas obligations in Louisiana no longer have any significant impact on the Chapter 11 reorganization process which has been substantially consummated. Texaco is free to conduct its post-confirmation business without the supervision by this court. If the oil and gas agreements are assumable under 11 U.S.C. § 365, a matter which Texaco disputes, this determination can be made by a bankruptcy court in Louisiana, where the venue regarding these agreements is more appropriate. To the extent that Louisiana's contract and mineral laws are relevant to the calculation of damages in the royalty disputes, a bankruptcy court in Louisiana is competently positioned to hear the issues and apply such law. Indeed, Texaco has submitted and obtained uncontested orders from this court to the effect that similar oil and gas leases were not subject to assumption under 11 U.S.C. § 365. Therefore, if it is determined as a threshold issue that 11 U.S.C. § 365 is not involved, and that Texaco need not assume the agreements, the Louisiana parties may not then employ 11 U.S.C. § 365(c)(1)(A) and applicable law to deprive Texaco of the benefits under the oil and gas agreements. The Louisiana parties will then have a claim for alleged underpayment of royalties which will have to

be determined pursuant to applicable Louisiana law.

In light of the facts pertaining to the disputes between the parties as to Texaco's rights under its oil and gas agreements in Louisiana, this court concludes that the Louisiana parties have sustained their burden of proving that the disputes in question should be transferred to the bankruptcy court in Louisiana for the convenience of the parties. Because the disputes in question share common questions of fact and law, they should be heard by one court. Therefore, these disputes should be transferred for venue purposes to the United States Bankruptcy Court for the Middle District of Louisiana.

Texaco argues that the Bankruptcy Judge for the Middle District of Louisiana was, prior to his appointment, employed by the State of Louisiana. If recusal is required, the federal court in Louisiana may direct another Bankruptcy Judge to hear the disputes or may withdraw the reference, if necessary. A withdrawal of the reference at this time would not be inconsistent with this court's previous recommendations on January 14, 1988, which were adopted by the United States District Court for the Southern District of New York. At that time there were objections to the plan of reorganization, and the plan had not yet been confirmed. Centralized administration was necessary in the interests of the debtors in possession and all other interested parties, including the general unsecured claim holders. In January of 1988, this court retained full supervision of the debtors' estates and their affairs. The debtors' goal for effecting a successful reorganization had not yet been achieved. Now that the reorganizational process has been substantially consummated, the need for centralized administration in this court is no longer paramount.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). These motions to change venue constitute core matters pursuant to 28 U.S.C. § 157(b)(2)(A).

2. The movants, the State of Louisiana, Lafourche Parish School Board and The Louisiana Land and Exploration Company, have sustained their burden of proof to support a change of venue pursuant to 28 U.S.C. § 1412.

3. The movants' motions are granted and, in the interests of justice and for the convenience of the parties, their disputes with Texaco Inc. arising out of its royalty payments under the Louisiana oil and gas agreements with the movants, shall be transferred to the United States Bankruptcy Court for the Middle District of Louisiana.

SETTLE ORDER on notice.