MINERAL RESOURCES,
INCORPORATED,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Natural Gas Pipeline Company of
America, Intervenor.

No. 85–1741.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 4, 1986.

Decided Dec. 30, 1986.

Edward H. Gerstenfield, Bethesda, Md., for petitioner.

Joel M. Cockrell, Atty., F.E.R.C., with whom Jerome M. Feit, Sol. and Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C., were on brief for respondent.

Karyl McCurdy Arnold, Lombard, Ill., for intervenor. Paul E. Goldstein, Chicago, Ill., and Paul W. Mallory, Lombard, Ill., were on brief, for intervenor.

Before WALD, Chief Judge, WILLIAMS, Circuit Judge, and WILL,* Senior District Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Petitioner Mineral Resources, Inc. ("MRI") seeks review of an order of the Federal Energy Regulatory Commission ("FERC" or "Commission"), in which the Commission held that certain natural gas was subject to the pricing provisions of § 104 of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3314. *See* 32 F.E.R.C. ¶ 61,122 (1985), Joint Appendix ("J.A.") at 37–41. Section 104 applies to "natural gas committed or dedicated to interstate commerce on November 8, 1978." 15 U.S.C. § 3314(a). Because we agree with the Commission that the gas at issue was committed or dedicated to interstate commerce on that date, the petition for review is denied.

### I. BACKGROUND

On September 26, 1922, A.J. and Augusta Dauer executed an oil and gas lease covering property they owned in Carson County, Texas. J.A. at 10. The lease was

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

acquired by Natural Gas Pipeline Company of America ("Natural"), which produced gas under the lease, sold it in interstate commerce for resale, and paid royalties to the owners. J.A. at 10–14.[1]

The 1922 lease stated that its duration was to be fifty years. J.A. at 10. After 1972, however, the owners of the property ("the Dauers") took no action to reassert control over the leased lands, and continued to accept royalties from Natural. J.A. at 14, 38.

In 1980, the Dauers executed a new lease granting gas rights in the same property to Mineral Resources, Inc. J.A. at 25. They then filed suit in 1981 in the United States District Court for the Northern District of Texas, seeking damages for Natural's alleged unlawful conversion of gas since 1972. *Id.* MRI intervened on behalf of the Dauers. *Id.*

In a decision issued on February 29, 1984, the District Court determined that the lease had expired on September 26, 1972, and that the gas produced under the lease since that time had been unlawfully converted. *Dauer v. Natural Gas Pipeline Company,* No. CA–2–81–118, slip op. at 7 (N.D.Tex. Feb. 29, 1984), J.A. at 15 [Available on WESTLAW, DCTU database]. The court held that the plaintiffs were entitled to damages measured by the amount of natural gas converted since June 4, 1979,[2] multiplied by the maximum lawful price for the converted gas at the time of conversion, with the defendant receiving a credit against the amount of damages for its payment of taxes, operating and maintenance expenses, royalties, and the cost of investment in the wells. *Id.* at 7–8, J.A. at 15–16. With the agreement of the parties,

the District Court referred the case to the Federal Energy Regulatory Commission for determination of the maximum lawful price for the gas during the relevant time period. J.A. at 20.[3]

MRI and the Dauers petitioned the Commission for a declaratory order that the gas at issue was entitled to pricing under § 109(a)(3) of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3319(a)(3). J.A. at 1–8. In response, Natural sought a declaratory order that the gas should be priced at the lower rate prescribed under § 104 of the Act, 15 U.S.C. § 3314. J.A. at 21–35. The Commission held that "the commencement of deliveries of natural gas in interstate commerce makes that natural gas ... 'dedicated,' regardless of the contractual basis of the transaction or the existence of a Commission certificate." J.A. at 39. Because the gas involved here had "been sold for resale in interstate commerce as part of [Natural's] interstate system supply for over 50 years," the Commission concluded that it was dedicated to interstate commerce and was therefore subject to the pricing provisions of § 104. J.A. at 39–40. MRI's petition for rehearing by the Commission was denied. *See* 32 F.E.R.C. ¶ 61,376 (1985), J.A. at 42.

## II. ANALYSIS

In this appeal, MRI again contends that the gas at issue is subject to the pricing provisions of § 109(a)(3) of the Natural Gas Policy Act. That section applies to "natural gas which was not committed or dedicated to interstate commerce on November 8, 1978, and which was not subject to an existing contract on such day." 15 U.S.C.

---

**1.** In 1939, the Dauers entered into an agreement consolidating the gas rights conveyed in the 1922 lease with those conveyed in a lease originally executed in 1921, and adding an additional forty acres of property in Carson County, Texas to the consolidated lease. J.A. at 10–11. The 1939 consolidation agreement stated that "[f]rom this time forward all of the lands described in the [1921 and 1922 leases, together with the additional 40 acres,] shall be considered as having been originally included in

the [1922] lease as to gas and gas rights." J.A. at 11.

**2.** The court determined that the two-year Texas statute of limitations applied and that therefore the plaintiffs were only entitled to damages from two years before the suit was filed. *Id.* at 7, J.A. at 15.

**3.** Pending the outcome of this appeal, no judgment has been entered in the action. J.A. at 19.

§ 3319(a)(3).[4]   MRI makes two arguments in support of this contention.

■ First, MRI asserts that the gas was not committed or dedicated to interstate commerce by Natural's delivery of gas into interstate commerce during the time that the lease was in effect, because no certificate for interstate sale of the gas had been issued by the Commission. *See* Brief for Petitioner Mineral Resources, Inc. at 8–10, 19–20. The Natural Gas Policy Act defines gas which is "committed or dedicated to interstate commerce" as "natural gas which, if sold, would be required to be sold in interstate commerce ... under the terms of any contract, any certificate under the Natural Gas Act, or any provision of such Act." 15 U.S.C. § 3301(18)(A)(ii). The FERC's position is that, although there was no contract of sale or Commission certificate which required this gas to be sold in interstate commerce, *see* Brief for Respondent Federal Energy Regulatory Commission at 14, Natural's delivery of the gas into interstate commerce during the term of the lease dedicated the gas to interstate commerce.

We agree with the Commission. The absence of a certificate seems no reason why the gas should be regarded as less committed and dedicated to interstate commerce than gas purchased by an interstate pipeline from an independent producer. The latter transaction would clearly require a certificate, *Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959), and the parties' failure to secure one would surely not entitle the producer to withdraw gas from the interstate market while its law-abiding fellow independent could not. If the omission for an independent's gas would not shelter it from commitment to interstate commerce, it would make little sense to find that pipeline-produced gas—the type earliest and most readily subject to Commission control[5]—was not committed merely for want of a certificate.[6]

This conclusion is supported by the Supreme Court's decision in *California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978). Like this case, *Southland* involved a fifty-year lease which granted the lessee the exclusive

4. It is undisputed that the gas here was not "subject to an existing contract" for sale in interstate commerce on November 8, 1978. *See* Brief for Respondent Federal Energy Regulatory Commission at 14.

5. Indeed, the evolution of the Natural Gas Act has been from Commission control over the wellhead price of pipeline-produced gas (the easiest case), to control over the price of a pipeline affiliate's gas, to control over the price of an independent producer's gas (the hardest case).

   At a relatively early stage, the Supreme Court held that the Federal Power Commission could, for purposes of regulating the pipeline's interstate wholesale selling prices, compute its gas costs by reference to the costs incurred by the pipeline or its affiliate rather than, as the pipelines urged, by reference to fair market value or a "fair field price." *See FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 614–15 n. 25, 64 S.Ct. 281, 293 n. 25, 88 L.Ed. 333 (1944); *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 597–604, 65 S.Ct. 829, 837–40, 89 L.Ed. 1206 (1945). Soon afterwards it held that gas sales at the wellhead by an affiliate of an interstate pipeline, to an interstate pipeline, were subject to Commission jurisdiction. *Interstate Natural Gas Co. v. FPC*, 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742 (1947).

Finally, it found in *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), that Commission jurisdiction extended to a wellhead sale by an independent producer to an interstate pipeline. Later, in *Public Service Commission v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 328, 103 S.Ct. 3024, 3030, 77 L.Ed.2d 668 (1983), the Court characterized *Phillips* as having "concluded that, for regulatory purposes, there was no essential difference between *the gas* a pipeline obtains from independent producers and *the gas* it obtains from its own affiliates...." (Emphasis added.)

6. *United Gas Pipe Line Co. v. FPC*, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181 (1966), confirms this view of the law. There the Court held that an interstate pipeline's cessation of purchases of gas produced by an independent from a particular field constituted an "abandonment" of facilities and of service, within the meaning of § 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b). The service found to have been abandoned was the "taking and transporting" of the gas in question. 385 U.S. at 88, 87 S.Ct. at 268. There seems no reason to believe that a pipeline's taking and transportation in interstate commerce of its own gas would any less constitute a service the termination of which would require § 7(b) approval.

right to produce and market oil and gas from the lands covered by the lease. The lessee applied for and was granted a certificate of public convenience and necessity of unlimited duration authorizing the sale of the gas in interstate commerce, and it contracted to sell the gas to an interstate pipeline. *Id.* at 521–22, 98 S.Ct. at 1956–57. When the lease expired, ownership of the remaining oil and gas reserves reverted to the lessor, which then attempted to sell the gas at the higher prices available in the intrastate market. *Id.* at 522, 98 S.Ct. at 1957. The Supreme Court held that the gas had been committed or dedicated to interstate commerce by the lessee's sales of the gas in interstate commerce during the term of the lease, and that therefore the remaining gas reserves could not be diverted from the interstate market to the intrastate market without obtaining authorization from the Commission pursuant to § 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b). *Id.* at 522–25, 98 S.Ct. at 1957–58.

MRI argues that *Southland* can be distinguished from this case because of the existence of a certificate of unlimited duration in *Southland. See* Brief for Petitioner Mineral Resources, Inc. at 8. This argument rests on an overly narrow reading of *Southland,* however. The gas at issue in *Southland* was sold in interstate commerce pursuant to a certificate issued by the Commission, and the Court held that "[t]he initiation of interstate service pursuant to the certificate dedicated all fields subject to that certificate." 436 U.S. at 525, 98 S.Ct. at 1958–59. The Court also stated more broadly, however, that "[g]as which flows across state lines for resale is dedicated to interstate commerce regardless of the intentions of the producer." *Id.* at 524, 98 S.Ct. at 1958. The Court explained that "the Act is concerned with the continuation of 'service' rather than with particular sales of gas or contract rights," and that "the obligation to continue [interstate] service attached to the gas, and bound all those with dominion and power of sale over the gas, including the lessors to whom it reverted." *Id.* at 526, 98 S.Ct. at 1959.

This emphasis on the importance of continuing interstate service once such service has begun is equally applicable to this case, in which no certificate was ever issued.

The Fifth Circuit has also held in a different context that gas which is sold in interstate commerce without a certificate is dedicated to interstate commerce. *Cox v. FERC,* 581 F.2d 449 (5th Cir.1978). In *Cox,* 80% of a natural gas unit's estimated reserves were subject to contracts and certificates for sale in interstate commerce, but the remaining 20% of the reserves were not. *Id.* at 450. For six years, however, the operator of the unit delivered all of the gas produced to an interstate pipeline. *Id.* The court noted the "undisputed facts [of] interstate delivery for a period of six years of 100% of the gas produced from the unit and concomitant payment to and acceptance of payments by interest owners in 20% gas as well as in 80% gas," and concluded that all of the gas, including the gas sold without a certificate, was dedicated to interstate commerce. *Id.* at 450–51; *see also Tenneco Exploration, Ltd. v. FERC,* 649 F.2d 376, 379–80 (5th Cir.1981). We conclude that the gas at issue here was dedicated to interstate commerce by its delivery into interstate commerce by Natural during the term of the lease.

█ MRI argues, however, that the gas falls within the *"Southland* exclusion" set out in § 2(18)(B)(iii) of the Natural Gas Policy Act:

(B) Exclusion.—Such term ["committed or dedicated to interstate commerce"] does not apply with respect to—

.   .   .   .   .

(iii) natural gas which, but for this clause, would be committed or dedicated to interstate commerce ... by reason of the action of any person (including any successor in interest thereof, other than by means of any reversion of a leasehold interest), if on May 31, 1978—

(I) neither that person, nor any affiliate thereof, had any right to explore

for, develop, produce, or sell such natural gas; and

(II) such natural gas was not being sold in interstate commerce (within the meaning of the Natural Gas Act) for resale. . . .

15 U.S.C. § 3301(18)(B)(iii). This provision was enacted in response to the Supreme Court's decision in *Southland.* *See* 124 Cong.Rec. 38,362 (1978) (post-conference "comprehensive explanatory statement" by House conferees). It was intended to protect producers who, before the issuance of the *Southland* decision on May 31, 1978, had presumed that when a lease expired any dedication resulting from sales in interstate commerce by the lessee lapsed, and that they were then free to sell the gas in intrastate commerce without authorization from the Commission. *See id.* at 38,362–63; *see also Falcon Petroleum v. FERC,* 642 F.2d 780, 783 (5th Cir. Unit A Apr. 1981).

The *Southland* exclusion by its terms does not apply to the gas at issue here, since it requires that "such natural gas was not being sold in interstate commerce" on May 31, 1978. Here the gas was sold by Natural in interstate commerce on that date, even though the lease had expired in 1972. MRI argues, however, that the gas should be considered as not having been sold in interstate commerce on May 31, 1978, since it was not sold by the owners of the gas (the Dauers), but by Natural, which had unlawfully converted the gas.

We must reject this attempt to circumvent the plain language of this statutory provision. There is no question here that the gas was actually being sold in interstate commerce on May 31, 1978.[7] Further, the Dauers are not within the group the *Southland* exclusion was designed to protect—unwitting owners who, after a lease terminated, began selling in intrastate commerce gas that had been sold in interstate commerce during the term of the lease, before the Supreme Court announced that it was illegal to do so. Although the lease here expired in 1972, the Dauers continued to allow Natural to sell the gas in interstate commerce and to accept royalties resulting from those sales.[8] The *Southland* exclusion cannot be extended, consistent with its language and purpose, to cover the situation presented here.

### III. Conclusion

The Commission correctly determined that the natural gas at issue here was

---

**7.** The legislative history indicates that the term "sold in interstate commerce" used in § 2(18)(B)(iii)(II) is to be interpreted literally:

This clause is intended to be based on the actual sale of gas in interstate commerce. Thus a contract and a certificate of public convenience and necessity authorizing the sale of gas that may be produced from a lease do not alone constitute natural gas being "sold in interstate commerce." The question is a factual one based upon whether actual sales of natural gas in interstate commerce had commenced and were ongoing on May 31, 1978.

124 Cong.Rec. 38,363 (1978) (post-conference "comprehensive explanatory statement" by House conferees).

**8.** It is instructive to compare the facts of this case with those presented in an example of the application of the *Southland* exclusion cited in the conference committee report on the bill which was enacted as the National Gas Policy Act of 1978. In explaining this provision, the conference report stated:

Several examples may be helpful. . . . Seller C is a lessee, who commits natural gas under a leasehold interest to interstate commerce in 1950. In 1971, the lease reverts to Seller D, and Seller D terminates the sales in interstate commerce. No natural gas from the lease is sold in interstate commerce for resale on May 31, 1978. Such natural gas is excluded from the definition of committed or dedicated. However, if Seller D had sold such natural gas in interstate commerce for resale on May 31, 1978, such natural gas would be committed or dedicated under the definition.

H.R.Conf.Rep. No. 1752, 95th Cong., 2d Sess. 72, *reprinted in* 1978 U.S. Code Cong. & Admin. News 8800, 8983, 8988. In this case, in contrast to the example, the Dauers did not take any action to terminate the sales in interstate commerce, and in fact the gas continued to be sold in interstate commerce. We cannot accept MRI's argument that the quoted language shows that a reversionary interest holder (rather than a holdover lessee like Natural) must be the *seller* for gas to be considered committed or dedicated; such a reading would elevate an incidental fact in an illustration to the status of an extratextual statutory requirement.

committed or dedicated to interstate commerce, and that therefore the pricing provisions of § 104 of the Natural Gas Policy Act should be applied.[9] The petition for review is accordingly

*Denied.*

---

**9.** Section 104 also requires that "a just and reasonable rate under the Natural Gas Act" have been in effect on November 8, 1978 for the gas at issue. 15 U.S.C. § 3314(a). Counsel for petitioner asserted at oral argument that, under this court's decision in *Phillips Petroleum Co. v. FERC,* 792 F.2d 1165 (D.C.Cir.1986), there was a substantial question as to whether any "just and reasonable rate" was applicable on that date to gas produced by pipeline companies, as opposed to gas produced by independent companies. *See id.* at 1169. It is true that in this case MRI, like Phillips, could have argued before the Commission that no just and reasonable rate had been established for gas produced by pipeline companies such as Natural. But it failed to do so; hence we have no duty to consider this question for the first time at this appellate stage. *See* 15 U.S.C. § 3417(a)(4) ("No objection to [an] order of the Commission shall be considered by the court if such objection was not urged before the Commission in the application for rehearing unless there was reasonable ground for the failure to do so.").