**In re TEXACO INC., Texaco Capital Inc., Texaco Capital N.V., Debtors.**

Bankruptcy Nos. 87 B 20142–87 B 20144.

United States District Court, S.D. New York.

April 5, 1988.

Weil, Gotshal & Manges, New York City, for debtors.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for The Chase Manhattan Bank.

Kronish, Lieb, Weiner & Hellman, New York City, for New York Life Ins. Co.

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for General Committee.

Keck, Mahin & Cate, Chicago, Ill., for Equity Committee.

William J. Guste, Jr., Atty. Gen., Mary Ellen Leeper, Asst. Atty. Gen., Taylor, Porter, Brooks & Phillips, Special Counsel, Baton Rouge, La., for State of La.

Deramee & Deramee, Thibodaux, La., for La Fourche Parish School Bd., David Landry, of counsel.

## DECISION ON MOTION BY CHASE MANHATTAN BANK FOR RELIEF FROM AUTOMATIC STAY

GOETTEL, District Judge.

Texaco Inc. and two of its subsidiaries have been involved in one of the most celebrated Chapter XI (debtor in possession) bankruptcy proceedings of modern times. Recently a plan has been approved by the Bankruptcy Court to bring them out of the proceedings. Last fall, Texaco made two motions for orders pursuant to the Bankruptcy Code, 11 U.S.C. § 365, approving its assumption of agreements with the State of Louisiana ("State") and the Lafourche Parish School Board ("School Board") of certain oil and gas leases. Thereafter, the State and the School Board moved to revoke the references to the Bankruptcy Court. These motions were referred to the Hon. Howard Schwartzberg, United States Bankruptcy Judge, for report and recommendation. On January 14, 1988, the Bankruptcy Court issued its recommendation that the reference withdrawal motions be denied. The State filed objections to the Bankruptcy Judge's recommendations. The School Board did not object. It has not been suggested by any party that the termination of the bankruptcy proceedings moots the State's motion.

The essential argument of the State is that the issue should not be decided in the Bankruptcy Court since it requires consideration of a non-Title XI law, namely, the Natural Gas Policy Act of 1978 ("NGPA"). Judge Schwartzberg, in his 32–page consideration of the issues, in his typical style, sets forth the factual background and discusses the legal issues with meticulous

care. Since no objections are raised to his detailing of the factual background, we will not repeat those facts. Judge Schwartzberg recommended that the reference should not be withdrawn pursuant to 28 U.S.C. § 157(d) for four reasons:

1. There are threshold issues which may render academic any consideration of the NGPA;

2. The State may lack standing to litigate NGPA issues;

3. In any event, the application of the NGPA to this proceeding does not require any substantial and material interpretation of the Act but merely *pro forma* application of the Act to the facts of this case;

4. No cause has been shown for a discretionary withdrawal of the reference under 11 U.S.C. § 365.

We agree with Judge Schwartzberg's interpretation of the issues and adopt his recommendations. There are threshold issues that would preclude any consideration of the NGPA.[1] There is also a respectable argument to be made that the State has no private right of action under the NGPA. (The State argues that the royalties payable should not be based on the contract price but on the market value of the gas sold, which requires interpretation of the NGPA.) Judge Schwartzberg concluded that only the Federal Energy Regulatory Commission has jurisdiction over the issues which arise under the NGPA and it is not a party to these proceedings.[2]

Most significantly, Judge Schwartzberg concluded that if consideration of the NGPA is necessary and if the State has a right to pursue such issues, its consideration would be a routine matter and not "substantial and material" as is required in withdrawing a reference from the Bankruptcy Court.

"It is issues requiring significant *interpretation* of federal laws that Congress would have intended to have decided by a district judge rather than a bankruptcy judge."

*United States v. Johns–Manville Corp., (In re Johns–Manville Corp.),* 63 B.R. 600 (S.D.N.Y.1986) (emphasis in original). If the NGPA must be referred to for purposes of setting royalties, it would be a straightforward application of a federal statute to the leases in question. The only aspect that makes application of the Act at all difficult is the shifting nature of the State's arguments with respect to it. It is the import of the State's arguments and not the application of the statute that is complex. We agree, therefore, that the reference need not be withdrawn as a matter of law and, finally, that no good cause for discretionary revocation has been demonstrated. Consequently, the State's and the School Board's motions requesting revocation are denied in all respects.

SO ORDERED.

## RECOMMENDATIONS WITH REGARD TO MOTIONS FOR WITHDRAWAL OF REFERENCE

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The State of Louisiana (the "State") and the Lafourche Parish School Board ("Lafourche") have filed motions with the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 157(d) for the withdrawal of the reference with respect to Texaco's motions for the assumption of certain natural gas leases which it entered into with the State and Lafourche. The State and Lafourche claim that the debtor, Texaco, underpaid royalties due them for natural gas that was sold by Texaco to its customers which was attributable to gas leases entered into between the State and Lafourche, as lessors and Texaco as lessee. The State and Lafourche contend that the resolution of Texaco's lease assumption motions requires

---

1. The State claims that the agreements in question are non-assumable and that they are not subject to 11 U.S.C. § 365. If the State is found to be correct in this regard, no reference to the NGPA will be necessary. Numerous other threshold claims are also put forth by the State.

2. Judicial review of Federal Energy Regulatory Commission orders are by appeal to the Court of Appeals. 15 U.S.C. § 3416(a)(4).

consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce, namely The Natural Gas Policy Act, 15 U.S.C. § 3301, *et seq.* ("NGPA").

Pursuant to an order of the United States District Court, to whom the State and Lafourche applied for the removal of the reference, District Court Judge Goettel has referred the withdrawal motions to this court for the purpose of making recommendations with respect to the disposition of such motions. The parties expressly consented at the hearing held in this court that this court shall submit such recommendations to the District Court.

## FACTUAL BACKGROUND

1. On April 12, 1987, the debtor, Texaco Inc. and its two wholly owned financial subsidiaries, Texaco Capital Inc. and Texaco Capital N.V., filed with this court their separate petitions for reorganizational relief under Chapter 11 of the Bankruptcy Code. Pursuant to an order issued by this court on that day the cases were directed to be jointly administered in accordance with Bankruptcy Rule 1015(b).

2. Texaco Inc. is operating its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3. By order dated July 10, 1987, this court established a procedure for Texaco's preservation of its oil and gas agreements and for all parties to those agreements to protect their interests (the "Procedure Order").

4. Pursuant to the Procedure Order, Texaco filed a motion dated September 15, 1987, for an order in the alternative, either (a) approving Texaco's assumption of ninety Oil and Gas Agreements (the "TL Agreements") it has with the State of Louisiana and finding an absence of any defaults thereunder on a final basis and not subject to subsequent audit, or (b) determining that any Agreement that cannot be assumed is neither an executory contract nor an unexpired lease for purposes of 11 U.S.C. § 365. *See Delta Energy Resources, Inc. v. Damson Oil Corp.,* 72 B.R. 7, 11 (W.D.La.1985) (under Louisiana Law,

a mineral lease was held to be treated as a real right, an incorporeal immovable, which is not the conventional lease contemplated by 11 U.S.C. § 365, but is in fact a real right in favor of another); *In re Heston Oil Co.,* 69 B.R. 34 (N.D.Okl.1986). (An oil and gas lease is not an unexpired lease or executory contract within the purview of 11 U.S.C. § 365 but is in the nature of an estate in real property having the nature of a fee). *But see In re Gasoil, Inc.,* 59 B.R. 804 (Bankr.N.D.Ohio 1986); *In re P.I.N.E., Inc.,* 52 B.R. 463 (Bankr.W.D.Mich.1985); *In re Integrated Petroleum Co., Inc.,* 44 B.R. 210 (Bankr.W.D.Ohio 1984) (oil and gas leases treated as assumable or rejectable contracts).

5. On September 17, 1987, Texaco filed a similar motion (the Lafourche Assumption motion) for an order in the alternative, either (a) approving Texaco's assumption of the lease and finding the absence of any defaults thereunder on a final basis not subject to subsequent audit, or (b) determining that if the lease cannot be assumed, it is neither an executory contract nor an unexpired lease within the meaning of 11 U.S.C. § 365.

6. Both the State and Lafourche responded by requesting various forms of relief including change of venue motions whereby the State and Lafourche seek orders transferring venue of the assumption of leases motions. By motion dated October 8, 1987 the State requested a transfer of venue to the United States District Court for the Middle District of Louisiana, where the State has pending against Texaco a prepetition Declaratory Judgment Action for cancellation of the leases in question because of Texaco's alleged default with respect to 44 leases to the extent of approximately $386,951,328. Lafourche seeks an order transferring venue of the Lafourche Assumption motion to the United States Bankruptcy Court for the Eastern District of Louisiana.

7. Pursuant to a Peremptory Objection dated October 14, 1987, the State requested an order denying Texaco's assumption motion. The Objection contained a detailed listing of the State's conclusions and speci-

fications as to various alleged defaults by Texaco, including claims for the underpayment of royalties.

8. The State also submitted an Objection and Answering Memorandum to Texaco's Assumption motion which refers to the Natural Gas Policy Act, 15 U.S.C. § 3301 *et seq.*, as determinative of the royalties due from Texaco based upon the maximum lawful prices allowed for certain categories of gas sold by Texaco for lands leased to it by the State.

9. Pursuant to an Objection dated October 7, 1987, Lafourche objected to Texaco's assumption motion and specified its reasons for concluding that Texaco has defaulted under oil and gas leases entered into with Lafourche.

10. On October 15, 1987, the State moved in the United States District Court for the Southern District of New York for an order pursuant to 28 U.S.C. § 157(d) revoking the reference of Texaco's assumption motion with respect to the oil and gas agreements with the State or finding them not subject to 11 U.S.C. § 365.

11. On November 6, 1987 Lafourche made a similar motion in the United States District Court for the Southern District of New York, seeking an order pursuant to 28 U.S.C. § 157(d) revoking the reference of Texaco's assumption motion.

### DISCUSSION

Both the State and Lafourche have raised certain threshold defenses based on state law and also under title 11, which if successful, would require a denial of Texaco's assumption motion without reference to any other federal laws. Thus, it is asserted that under Louisiana law, an oil and gas lease cannot be assigned or assumed without the approval of the Louisiana Mineral Board, which will not approve Texaco's assumption. Therefore, under 11 U.S.C. § 365(c)(1), applicable local law excuses the State and Lafourche from allowing Texaco to continue to extract oil and gas from the leases in question. If the State and Lafourche are correct as to this proposition, no other federal law will be involved for interpretation or construction.

However, the State and Lafourche contend that if they are not successful in sustaining their threshold objections, this court will be required to consider and interpret various sections under the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.*, in order to resolve Texaco's assumption motions.

### NATURAL GAS POLICY ACT

The NGPA, which was enacted in 1978, was a Congressional response to the prior existence of two separate natural gas markets; a regulated interstate market and an unregulated intrastate natural gas market. The price disparity between the regulated interstate market and the unregulated intrastate market prompted many producers to sell their production in the higher intrastate market, resulting in shortages in the interstate market. The provisions of NGPA established price ceilings for all first sales of natural gas irrespective of its interstate or intrastate character. It was held that Congress may regulate activities which are wholly intrastate when the intrastate activity either has a substantial economic effect on interstate commerce or where federal regulation of the intrastate activity is necessary to effectuate its interstate regulation. The *State of Oklahoma etc. v. Federal Energy Regulatory Commission*, 661 F.2d 832 (10th Cir.1981).

Section 102 of NGPA, 15 U.S.C. § 3312, specified a maximum ceiling price for new natural gas. Section 105 of NGPA, 15 U.S.C. § 3315, set a ceiling price for sales under existing intrastate contracts. Section 106 of the NGPA, 15 U.S.C. § 3316, established maximum ceiling prices for first sales under rollover contracts. The term "Rollover Contract" is defined under the NGPA to mean "any contract, entered into on or after November 9, 1978, for the first sale of natural gas that was previously subject to an existing contract which expired at the end of a fixed term ... specified by the provisions of such existing contract, as such contract was in effect on November 9, 1978, whether or not there is an identity of parties or terms with those of such existing contract." 15 U.S.C.

§ 3301(12). Additionally, Section 109 of the NGPA, 15 U.S.C. § 3319, established a maximum lawful price for other categories of natural gas.

Pursuant to 15 U.S.C. § 3411, the Federal Energy Regulatory Commission ("FERC") is authorized to administer, enforce and review the provisions of the NGPA. The NGPA does not grant a private right of action.

The interaction of the contract price and the maximum lawful prices for intrastate gas under contracts existing on the effective date, namely November 9, 1978, was stated as follows:

> Section 105 and 106(b) apply to gas under an intrastate contract that was in effect on the NGPA's date of enactment. They are the only NGPA provisions that expressly make the contract price the maximum lawful price. If the contract price on November 9, 1978, was greater than the section 102 new gas price, then under section 105(b)(2) the maximum lawful price is that November 9th contract price until the section 102 price catches up to the inflation adjusted contract price. If, on the other hand, the price on November 9th was less than section 102, under section 105(b)(1) the maximum lawful price is the current price provided for under the terms of the contract as long as it does not exceed the section 102 price.

*Pennzoil Co. v. Federal Energy Regulatory Commission,* 645 F.2d 360, 374–375 (5th Cir.1981).

In 1980, the State brought an action against Texaco for underpayment of royalties. The action was compromised in 1981 with Texaco paying the State $28 million and the parties agreeing that Texaco would pay royalties based on the contract prices whenever gas came from an existing well and that Texaco would pay royalties based on the maximum prices allowed under the NGPA whenever gas came from new wells.

The State contends that as old existing contracts expired a proportionate share of the gas was available for sale under a rollover contract and that Texaco should have sold this gas in accordance with Section 106(b)(2) of the NGPA, the rollover contract provision. Instead, the State contends that Texaco formed two subsidiary corporations Bridgeline Gas Distribution Company and Riverway Gas Pipeline and that these subsidiaries entered into contracts with some of the former customers to supply these customers with gas. Additionally, the State argues that there was a commingling of gas in the same pipelines as other gas that was sold at higher prices so that the State's gas should be deemed sold at the higher prices.

Thus, by referring to NGPA in the Compromise Agreement of 1981 for purposes of determining royalties, the State maintains if the NGPA price ceilings are found applicable, that an interpretation of NGPA is necessary for the purpose of computing the defaults or underpayments of royalties which the State contends are due to it under its leases with Texaco.

Lafourche does not contend that the NGPA is applicable to its royalty claims, but that Texaco asserts the maximum allowable prices under NGPA as a defense to minimize the amount of royalties claimed by Lafourche.

### THE STATE'S DISPUTE

The Texaco dispute with the State dates back to 1953 when Texaco constructed the Louisiana Industrial Gas Pipeline System ("LIS") for the purpose of delivering gas produced in Southern Louisiana to potential and existing industrial users along the Mississippi River. LIS is an intrastate pipeline delivering gas only within the State of Louisiana.

Texaco then entered into numerous contracts with industrial users in which Texaco warranted the delivery of a specified volume of gas for a specified price. The contracts did not state the source of the gas. These contracts are commonly referred to as "Warranty contracts." In order to fulfill the Warranty contracts, Texaco delivered natural gas from various sources including those lands which were covered by gas leases issued by the State,

for which Texaco is required to pay royalties to the State.

Prior to the 1981 Compromise Agreement with the State, Texaco had computed royalties based on a weighted average price which took into consideration all customers on LIS. A weighted average price was used to compute royalties because Texaco contended that each LIS customer is delivered its proportionate share of each molecule of residue gas produced from Texaco committed properties. No single field or lease flows to any LIS customer.

LIS gas comes from numerous sources other than under Texaco's leases with the State. The gas from all sources is commingled. Therefore, it is impossible to identify the source of gas for a specific consumer. Texaco's volume allocation system allocates all LIS dispositions back to the various sources on a proportionate basis. The State maintains that in determining the weighted average price to pay State royalties, Texaco arbitrarily assigned production allocated to the State's old wells to the remaining old low price contracts. Because of this allocation, the State believes that Texaco underpaid the State in excess of $103,000 on Compromise leases.

In determining underpaid royalties claimed, the State used the market value on all production attributable to the non-compromise leases up to the time the Natural Gas Policy Act (NGPA) became effective in November of 1978. The State maintains that the NGPA is an influencing factor in determining the market price, or what a gas purchaser would pay for natural gas in the open market. The NGPA sets a ceiling for natural gas but does not establish prices.

The State contends that if the market price on the date of the enactment of the NGPA was greater than the Section 102 price for new gas under NGPA, then the market price would be frozen until such time as the price could escalate as provided under Section 102. Thereafter, the State would claim the Section 102 price for periods after November, 1978. The State claims that under this analysis Texaco has underpaid the State on the non-compromise leases the sum of $283,871,355 in principal together with interest.

The State has also made an alternative computation based upon Texaco's position. On this basis, all gas that was flowing on the date of the enactment of the NGPA would be considered as being dedicated to the fulfillment of the existing industrial contracts which Texaco had. All of the old gas from these wells would thereafter be limited under the provisions of Section 105 of the NGPA to the contract price until such time as the contract terminated by its own terms. Thereafter any gas which had been subject to a terminated contract would be available for pricing under Section 106 of the NGPA, which provision governs a rollover contract. Under the rollover provisions of Section 106 Texaco would be limited in the amount it could sell the gas to its industrial customers. If the prior contract was for less than $1.00 per unit then Texaco could only sell it under a new contract of $1.00 per unit plus escalation as provided under the NGPA. If the old contract was more than $1.00 per unit on the date of the expiration of the contract, then Texaco could sell it for the maximum price provided under the expired contract plus an escalation factor. These rollover limitations do not apply to the State's royalty share. The maximum lawful price under a rollover contract would go to the Section 102 price (new gas) which would be substantially higher than the expired contract prices or the $1.00 plus escalation. The Section 106 gas (rollover contracts) was deregulated on January 1, 1985. Therefore, Texaco was required to pay royalties after January 1, 1985 at the market value of the Section 106 gas. On this basis, the State claims that Texaco owes a minimum of $40,073,094 including interest for the period between January 1, 1979 through December, 1985. For periods between January 1, 1970 to December 31, 1978, the State calculates that Texaco has underpaid royalties in the sum of $163,586,247, including interest and using market value prices.

As reflected in the affidavit of George E. Reese, a certified public accountant, which

was sworn to on December 9, 1987, and which was submitted on behalf of the State, the dispute between the State and Texaco as to the calculation of royalties due to the State, hinges upon a resolution of several factors regarding the application of the NGPA. Thus, there is an issue as to whether various sales contracts by Texaco or its subsidiaries are subject to Section 105 of the NGPA, which deals with the ceiling price for sales under intrastate contracts existing on November 8, 1978; or Section 109 of the NGPA, which sets ceiling prices for other categories of natural gas; whether certain wells qualify for Section 102, 103 or 109 pricing; whether NGPA maximum lawful prices are a factor in determining fair market value for the payment of royalties; and whether the production from State leases is subject to Section 105 (existing intrastate contracts on November 8, 1978) or Section 106(b)(2) of the NGPA, which authorizes higher maximum lawful prices for the State's royalty gas with respect to intrastate rollover contracts, as permitted under NGPA Section 102, which relates to new natural gas.

Texaco disputes that the NGPA is applicable and points to the fact that what is at issue is a royalty agreement from itself and the movants and an interpretation of the NGPA is not required in the context of the royalty agreements.

The NGPA has application, if at all, to the sales of natural gas to Texaco's own customers, which merely serves as a guide for translating the extent of the royalties Texaco owes to the movants.

## WITHDRAWAL OF THE REFERENCE

■ The litany of cases decided under 28 U.S.C. § 157(d) hold there are three conditions in the statutory language of § 157(d) that must be met to justify a withdrawal of the reference by the District Court. First, the person seeking withdrawal must be a party. Second, the motion to withdraw the reference must be timely. Third, resolution of the proceeding must require consideration of non-bankruptcy federal statutes regulating interstate commerce. *In re Baldwin United Corp.*, 57 B.R. 751, 753

(S.D.Ohio 1985). Texaco does not dispute Louisiana's or Lafourche's standing to bring this motion.

*Mandatory Withdrawal*
### A. Timeliness

■ In *In re Giorgio*, 50 B.R. 327 (D.R.I. 1985), where the movants waited a year before filing a motion to withdraw the reference, the court interpreted timely as being "at the first reasonable opportunity". The court explained that timely filing of motion to withdraw the reference is necessary to protect the court and parties in interest from useless costs and disarrangement of the calender, and to prevent unnecessary delay and the use of stall tactics. *In re Giorgio*, 50 B.R. at 328–29 (Where the court held the filing of the withdrawal motion untimely); *In re Chateaugay Corp.* (case No. 86 B 11270) (BRL) (S.D.N.Y. July 17, 1987). However, courts acknowledged that when determining whether something is timely, it must be evaluated in the context of the specific situation. *In re Baldwin–United Corp.*, 57 B.R. at 753 (where the movants waited thirteen months after filing their claims before moving to have the reference withdrawn from the bankruptcy court and where a plan for reorganization had been filed and a deadline for confirmation established, the court held the status of the bankruptcy and the extensive delay by the movants deemed it particularly important to apply the timeliness requirement strictly); *In re I.Q. Telecommutations, Inc.*, 70 B.R. 742 (N.D.Ill.1987) (Where movants filed a withdrawal motion approximately 13 months after the initial complaint was filed which included a RICO claim, the court held the filing untimely because the movants were aware of the disputed federal claim from the date of the filing of the complaint). The court must take into consideration the status of and the effect such a motion has on the bankruptcy proceedings. 130 Cong.Rec. S7621 (daily ed. June 19, 1984). Therefore, a motion is timely if it is made as soon as possible in light of the status of the bankruptcy proceedings. *In re Baldwin*, 57 B.R. at 754. However,

where there did not appear to be unreasonable delay and the debtors are not prejudiced by such a delay then a motion is not considered untimely. *Interconnect Telephone Services, Inc. v. Farren, (In re Interconnect Telephone Services)* 59 B.R. 397 (S.D.N.Y.1986) (where a year had elapsed from the time the action was filed to the time the motion was made to withdraw the reference, the court found the withdrawal motion was timely); *Burger King Corp. v. B–K of Kansas, Inc.,* 64 B.R. 728 (D.Kan.1986) (Where debtors motion to withdraw the reference was initiated 10 months after the filing of their original motion, the court found the withdrawal motion timely stating ten months is the outer limit of time for the court to permit a filing of a withdrawal motion and where such filing did not prejudice the position of the other parties to the action).

■ Texaco contends the State of Louisiana and Lafourche Parish (the "movants") failed to file their withdrawals motions in a timely fashion. First, the debtor asserts the movants knew as early as June 1987, when Texaco filed its first motion to preserve the Texaco/Louisiana agreements, that federal laws could be in dispute. Second, Texaco argues that Louisiana knew on July 10, 1987 that an Assumption motion would be filed in September 1987. Third, Texaco asserts that the movants could have taken action to file a withdrawal motion in response to Texaco's Assumption motion filed on September 15, 1987. Instead, Louisiana merely filed its Venue motion, its Objection, and its Peremptory Objection in response to the Assumption motion and filed its withdrawal motion on October 15, 1987. Lafourche's withdrawal motion was eventually filed on November 6, 1987.

The movants' withdrawal motion was not untimely. Although in June of 1987 Louisiana was aware that Texaco "preserved" the agreements, there is no indication that it knew whether Texaco would assume or reject the agreements thereby anticipating the forum and nature of the proceedings. A motion was not filed by Texaco at that time. The July 12, 1987 order, known as the Global Order, merely prescribed a procedure by which Texaco could assume or reject approximately 55,000 executory contracts or unexpired leases. The Global Order would not have informed the movants that their leases were to be assumed or rejected thereby indicating whether their damages would be litigated in this court to cure any prepetition default or if upon rejection another court would litigate its damages. In addition, because an Assumption motion had not yet been filed in the bankruptcy court, a withdrawal motion, at that time, would have been premature.

Although the movants could have filed a withdrawal motion with their other responses to Texaco's September 15, 1987 assumption motion, waiting to file it until October 15, 1987 and November 6, 1987, did not prove fatal to a timely filing of the motions. There is no assertion by Texaco that pre-trial preparation had proceeded to such an extent that a withdrawal motion would result in any prejudice. The only prejudice Texaco asserts is that it must divert its attention from preservation of the Texaco/Louisiana agreements and contest the withdrawal motion. This assertion does not arise to the level of prejudice justifying a denial of the withdrawal of the reference for failing to file it in a timely manner.

The status of the proceedings of this bankruptcy also does not indicate any prejudice resulting from the filing of this motion in November of 1987 instead of September of 1987. A plan of reorganization had not yet been filed by the debtors. Though the debtor's exclusivity period was to terminate on December 8, 1987, it did not appear likely that a plan would be filed by that time especially in light of the fact that the Debtors filed a motion to extend the exclusive period with a hearing date of December 2, 1987. It does not appear the movants are attempting to cause unnecessary delay or use stall tactics.

Based on the particular circumstances in this case and the permissiveness of other courts in allowing a movant to file a withdrawal motion where no prejudice will result, where no plan of reorganization has been filed, and where it does not appear

that the movants are forum shopping, the movants filed their withdrawal motion in a timely manner.

### B. Consideration of Non–Code Federal Law

■■■■ 28 U.S.C. § 157(d) states that the district court may withdraw the reference when it "determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce". However, the mere assertion that consideration or interpretation of a non-code federal statute may be required is not sufficient to justify mandatory withdrawal of the reference from the bankruptcy court. Mandatory withdrawal of all proceedings requiring any consideration of non-code federal law would require district courts to withdraw matters in which "Code questions overwhelmingly predominate and consideration of non-Code statutes would be de minimus". *In re White Motor Corp.*, 42 B.R. 693, 703 (N.D.Ohio 1984); *In re Baldwin–United Corp.*, 57 B.R. 751, 757 (S.D.Ohio 1985). Incidental consideration of non-bankruptcy federal statutes is not sufficient. *In re Baldwin–United Corp.*, 57 B.R. at 757; *Michigan Milk Producers Association v. Hunter*, 46 B.R. 214, 216 (N.D. Ohio 1985). Therefore, the movant must demonstrate that a resolution of the proceedings will require substantial and material consideration of the non-code federal laws. *Pension Benefit Guaranty Corp. v. LTV Corp. (In re LTV Corp.)*, 86 B.R. 33 (S.D.N.Y.1987); *In re Hawkeye Chemical Co.*, 73 B.R. 318 (Bankr.S.D.Iowa 1987); *Boricua Motors Corp. v. Tamachi, Inc.*, 76 B.R. 891 (D. Puerto Rico 1987); *In re Johns–Manville Corp.*, 63 B.R. 600 (S.D.N.Y.1986); *Burger King Corp. v. B–K of Kansas, Inc.*, 64 B.R. 728 (D.Kan.1986); *In re Baldwin–United Corp.*, 57 B.R. 751 (S.D.Ohio 1985); *In re Maislin Industries, U.S., Inc.*, 50 B.R. 943 (Bankr.E.D.Mich.1985); *In re White Motor Corp.*, 42 B.R. 693 (N.D.Ohio 1984). Neither party in this proceeding disputes the applicability of the "substantial and material consideration" standard.

■■■ In addition to the substantial and material consideration standard a court should take into consideration whether the withdrawal motion is based upon speculation about federal issues which may or may not arise and may or may not be germane to resolution of core Code proceedings. If such speculation did exist and a withdrawal of the reference was allowed, this would be "inconsistent with the purposes underlying the Bankruptcy Code and would encourage forum shopping in a manner Congress disdained when it sought to avoid 'creating a multiplicity of forums for the adjudication of part of a bankruptcy case'". *In re White Motor Corp.*, 42 B.R. at 705; *In re Baldwin–United Corp.*, 57 B.R. 751.

#### 1. *Substantial and Material Consideration*

■■■ The ambiguity of the phrase "substantial and material consideration" leaves it open to dispute in each withdrawal of the reference proceeding. In construing this phrase courts have held substantial and material consideration arises when a determination of issues requires "significant *interpretation* of federal laws that congress would have intended to have decided by a district judge rather than a bankruptcy judge", *United States v. Johns–Manville Corp. (In re Johns–Manville Corp.,)* 63 B.R. 600, 602 (S.D.N.Y.1986) (emphasis in original), or where issues arising under non-title 11 laws dominated those arising under title 11 withdrawal of the reference may be mandated. *Wooton v. Department of Interior*, 52 B.R. 74, 75 (W.D.La.1985); *United States v. ILCO, Inc. (In re ILCO, Inc.)*, 48 B.R. 1016, 1022 (N.D.Ala.1985). Section 157(d) should be construed narrowly and not become an "escape hatch" through which bankruptcy matters will be removed to the district court. *In re White Motor Corp.*, 42 B.R. at 704. A distinction must be made between proceedings which require the court to make a "significant *interpretation*" of a federal statute as opposed to making an insignificant interpretation or merely *applying* the law to the facts. *In re Johns–Manville Corp.*, 63 B.R. at 602. If the court is only required

to do the latter, then mandatory withdrawal is not warranted.

## 2. *The Issues*

Neither the debtor nor the movants dispute the fact that proceedings concerning assumption of unexpired leases have generally been held to be core proceedings under 28 U.S.C. § 157(b). *See Matter of Republic Oil Corp.*, 51 B.R. 355 (Bankr.W.D. Wisc.1985); *In re L.T. Ruth Coal Company, Inc.*, 66 B.R. 753 (Bankr.E.D.Ky.1986). The issues which the movants assert arise under 11 U.S.C. § 365 include without limitation: (1) whether the right to cure pre-petition defaults afforded by 11 U.S.C. § 365(b)(1) is subordinate to the right to seek cancellation of the lease contracts under state law, given the alleged willful breach of the contracts by Texaco and applicable state law which grants cancellation upon a showing under state law that damages are inadequate; (2) whether 11 U.S.C. § 365(d)(3) precludes assumption given post-petition default in the performance of unexpired leases of real (immovable) property; (3) the nature of adequate assurance of future performance required by 11 U.S.C. § 365(b)(1)(C), in the event the leases are determined to be assumable; and (4) whether 11 U.S.C. § 365 affords Texaco the right to obtain an order regarding the extent of default which would preclude further audit or review, despite contractual provisions and applicable state law. Additionally, the movants filed an adversary complaint which seeks a determination under 11 U.S.C. § 365(d)(3) that the interest of Texaco as debtor in possession should be cancelled on account of pre- and post-petition default under state law.

Regarding consideration of non-title 11 United States Laws, the movants assert that resolution of these proceedings will require substantial and material consideration of the NGPA. Such consideration of the NGPA will purportedly be necessary because the claims arising under the Compromise Agreement involve an interpretation and application of the pricing under Sections 102, 105(b), 106(b)(2) and 109(b) of the NGPA.

In response Texaco argues: (1) If the leases are retroactively terminated under Louisiana state law, this would result in a distribution back to Louisiana of the leasehold estates granted under the Texaco/Louisiana Agreements, leaving no property of the estate for Texaco to preserve and no title 11 issues raised in the Assumption Motion would ever be considered; (2) If 11 U.S.C. § 365(c) bars assumption of the Texaco/Louisiana Agreements then Texaco's Assumption motion would be denied obviating further consideration of any other United States Laws by the Bankruptcy Court; (3) If the Assumption motion were denied and Louisiana and Lafourche wanted to pursue its damages claim after the denial, they could file proofs of claim and a new proceeding could be commenced; (4) The disputes which arise under the NGPA are not over what prices it sets but over when and if the ceiling price is applicable; (5) There is no dispute as to the definition of a "rollover contract" under the NGPA; (6) Louisiana has no standing to bring an action under the NGPA against Texaco, as it is not FERC or the Attorney General; (7) Even if Louisiana and Lafourche have standing there is no action to bring because they are not purchasers of the gas, they are entitled to receive royalties. (8) This action is a simple contract action requiring only an interpretation of state law not non-title 11 federal law.

The issues this court believes are most relevant to a resolution of this withdrawal of the reference proceeding include: (a) Whether there will be the necessity to consider the NGPA at all when resolving the damage issue (i) because the leases may not be assumable under 11 U.S.C. § 365; (ii) whether Louisiana and Lafourche have the ability to enforce the provisions of the NGPA and whether both parties have standing to bring a cause of action under the NGPA; (iii) if the provisions of the NGPA preclude judicial review prior to a final determination by FERC; and (iv) the terms of the Compromise Agreement which prescribe relief be sought in a jurisdictional agency and/or by arbitration; and (b) If consideration of the NGPA is required, is

such consideration substantial and material to the resolution of this proceeding?

#### (a) NGPA's Speculative Application

■ First, a dispute exists as to whether the oil and gas leases at issue are executory contracts or unexpired leases for purposes of 11 U.S.C. § 365. If it is determined that the leases are *not* assumable under § 365 then the State and Lafourche will be relegated to general unsecured creditors and may pursue a breach of contract action in the bankruptcy court or, by order of the bankruptcy court, may seek relief from the automatic stay pursuant to 11 U.S.C. § 362, to pursue their actions in a different forum. Therefore, it is highly speculative whether the NGPA issues will be heard in the Bankruptcy Court. The threshold issue to be resolved is whether or not the leases are assumable. It is only after this issue is resolved that the NGPA issues *may* arise.

■ Even if the leases are assumable under § 365, both Louisiana and Lafourche assert that the NGPA is not applicable under the terms governing payment of royalties under the leases. Texaco argues that the NGPA prices are not necessarily applicable under the leases and that a consideration, if any, of the NGPA would merely be utilized as an indicia of the ceiling price. All the parties acknowledge the fact that the NGPA may not even be considered by a court once state contract law is applied to determine whether market value, the contract price or the NGPA is the applicable governing price provision. However, the mere assertion that a cause of action may arise under a non-title 11 federal statute is not sufficient to justify federal court jurisdiction and mandatory withdrawal from the bankruptcy court. *See Phillips Petroleum Company v. Texaco*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974) (Where the court held that for purposes of Federal District Court jurisdiction under 28 U.S.C. § 1331(a), in order for a claim to arise under the constitution, law, or treaties of the United States, the federal questions must be disclosed upon the face of the complaint, unaided by the answer, and the complaint itself will not avail as a basis of jurisdiction insofar as it goes beyond the statement of the plaintiff's cause of action and anticipates or replies to a probable defense).

■ Second, Louisiana and Lafourche do not have the ability to enforce the provisions of the NGPA nor is it likely they would have standing to initiate a cause of action under the NGPA. With the exception of enforcement of emergency orders and of incremental pricing, enforced by the President and the Secretary, FERC or the Secretary of Energy, respectively, only FERC may bring an action in the District Court of the United States to enforce civil compliance with the NGPA. 15 U.S.C. § 3414(b)(1). Only the Attorney General may institute appropriate criminal proceedings under the NGPA. 15 U.S.C. § 3414(b)(5). Absent a constitutional question regarding the enactment of the NGPA or judicial review of a final determination of an agency action, in this case FERC, there is no private right of action under NGPA. 15 U.S.C. § 3416(a) states:

\* \* \* \* \* \*

(4) Judicial Review. Any person who is a party to a proceeding under this chapter aggrieved by any final order issued by the Commission in such proceeding may obtain review of such order in the United States Court of Appeals for any circuit ... Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part.

*See State of Oklahoma v. Federal Regulatory Commission*, 494 F.Supp. 636 (W.D. Okl.1980) (Individual alleging that he was an Oklahoma citizen selling natural gas in intrastate commerce had established constitutional standing to litigate claims that price classifications of this chapter had no rational basis and that bifurcated system of pricing determination invaded state sovereignty as he had 19 wells affected by pricing provisions and had applications pending before the state agency). *Pennzoil Co. v. Federal Energy Regulatory Commission*, 645 F.2d 394 (5th Cir.1981) (where on review of Orders of FERC, the

court held that requirement that agency's actions be ripe for judicial review before merits of any review petition will be addressed is one which applies to action of other agencies as well as that of the Federal Energy Regulatory Commission); *See also* 15 U.S.C. § 3413 (Judicial review of final determinations by State and Federal Agencies); *Williston Basin Interstate Pipeline Co. v. Federal Energy Regulatory Commission,* 816 F.2d 777 (D.C.Cir. 1987) (Where the court held that FERC may designate a jurisdictional agency to make determinations of the provisions of the NGPA specified in 15 U.S.C. 3413, and may review the jurisdictional agency's factual determinations to ensure they were supported by "substantive evidence". Only where FERC does not uphold the jurisdictional agency's decision will judicial review be available). In fact courts refer issues of the maximum lawful pricing under the NGPA to FERC for final determination. *See Mineral Resources, Inc. v. Federal Energy Regulatory Commission,* 808 F.2d 107, 109 (D.C.Cir.1986).

FERC is not a party to these proceedings. In the event FERC became a party to these proceedings, any civil enforcement action initiated by FERC pursuant to 15 U.S.C. 3414(b)(1) would be brought in the district court. If FERC issued a final order to a party to a proceeding under the NGPA, judicial review of that order would be by the Court of Appeals. 15 U.S.C. 3416(b)(4). However, because FERC is not a party to this proceeding and there does not appear to be a final order issued by FERC for judicial review, it is speculative that the bankruptcy court or any federal court may have jurisdiction over the issues which arise under the NGPA, thereby precluding any significant interpretation of the NGPA.

The third reason it is speculative that the bankruptcy court would be required to review applicable pricing provisions under the NGPA stems from the terms of the Compromise Agreement. Subparagraph 4(I) of the agreement states

Royalties to be calculated and paid on any maximum lawful price under the NGPA shall be so paid from and after the date Texaco, or any of its assignees or sublessees, makes application to the appropriate jurisdictional agency for a price determination for each well subject to such regulation.

Subparagraph 4(k) states

In the event a dispute arises *as to the determination of the price basis upon which royalties are to be calculated* and Texaco and State, through the State Mineral Board, are unable to resolve the dispute amicably, it *shall* be finally resolved by binding arbitration in the manner set forth hereinafter in subparagraph 5(b) of this agreement. All issues or disputes arising under this Paragraph 4, other than disagreement as to the determination of the price basis upon which royalties are to be calculated, are specifically excluded from this requirement of arbitration ... (emphasis added).

Subparagraph 5 states,

(a) In the event a dispute arises as to the parties' compliance with any of their respective obligations under this Compromise Agreement for which it is provided that Texaco or State may demand arbitration, the following procedures shall be used.

(b) Any such dispute shall be finally resolved by binding arbitration conducted by a tribunal of three (3) arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association (AAA), except as modified herein ... *The Louisiana State Courts shall have sole jurisdiction of any court proceeding related to such arbitration. This agreement to arbitrate and any awards shall be specifically enforceable under the provisions of the Louisiana Arbitration Law (La.–R.S. 9:4201, et seq.).* (emphasis added).

Upon interpreting the Compromise Agreement these arbitration clauses may preclude any court from interpreting the applicable price provisions or from reviewing any arbitration decision. Although there are leases which are at issue in this proceeding which are not subject to the Compromise Agreement (Non–Compromise

Agreements), they are also not subject to the specific application of the NGPA in the price provisions of the leases. Consideration of the pricing provisions of the NGPA as applied to the non-Compromise Agreements is less likely than on those leases subject to the Compromise Agreement. Therefore, required interpretation or application of the NGPA is speculative and may not be germane to the resolution of these proceedings, thereby failing to satisfy the requirements of 28 U.S.C. § 157(d) which would entitle the district court to make a mandatory withdrawal of the reference from the bankruptcy court.

(b) Consideration of the NGPA

 If any consideration of the NGPA is necessary, such consideration would not be substantial and material to the resolution of the proceedings. *In re White Motor Corp.*, 42 B.R. 693 (N.D.Ohio 1984); *In re Baldwin–United Corp.*, 57 B.R. 751 (S.D.Ohio 1985). Assuming the NGPA price ceiling is applicable, the relevant provisions include Sections 102, 105, 106 and 109. These provisions govern the nature of the agreement, i.e. a Rollover Contract, and its applicable ceiling price. The parties do not dispute the definitions or terms of the provisions but merely dispute their application. Therefore, the bankruptcy court would not be required to interpret the language of the statute, but merely apply the law to the facts. Such consideration of the statute is not substantial and material because it does not involve "significant interpretation" of the NGPA. *In re Johns–Manville Corp.*, 63 B.R. at 602. Nor do the issues that could potentially arise under the NGPA dominate the issues arising under title 11 and state law. *In re White Motor*, 42 B.R. at 703; *In re Baldwin–United*, 57 B.R. at 757; *Superior Oil Co. v. Pioneer Corp.*, 706 F.2d 603 (5th Cir. 1983) (federal question jurisdiction was not invoked under 28 U.S.C. § 1331 in action between gas seller and purchaser under gas sale contract which "stripped to its essentials, ... seeks enforcement of state-created contract rights" even if the dispute pivots on issues of federal law).

Accordingly, a consideration of the NGPA, if any, would not be substantial and material because there would not be significant interpretation of the NGPA. The alleged NGPA issues do not predominate over the title 11 and state law issues and a consideration or utilization of the statute, if any, would merely require an application of law to fact.

*Discretionary Withdrawal*

 28 U.S.C. § 157(d) states

The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown ...

Pursuant to § 157(d) the district court may withdraw the reference from the Bankruptcy court if "cause" is demonstrated.

In *Pacemaker Diagnostic Clinic of America v. Instromedix*, 725 F.2d 537 (9th Cir.1984), the court stated,

The district court's power to void a reference *sua sponte* is predicated upon good cause, a term yet to be explored in the context of specific cases. It would seem at a minimum, however, that good cause for resumption of direct Article III control exists in a case where a political branch of the government is directly affected, or where a substantial constitutional question is presented, or where rights of numerous parties not present before the court might be affected by the decision, or in any other case containing sensitivities such that determination by an Article III judge is required to insure the appearance and the reality of independence and impartiality in the decision. See S.Rep. No. 74, 96th Cong., 1st Sess. 14, reprinted in 1979 U.S. Code Cong. & Ad.News 1469, 1483.

Louisiana asserts that discretionary reference revocation may be appropriate. However, it fails to demonstrate good cause for such a revocation. The issues and parties involved in this proceeding do not concern or directly affect a political branch of the government, nor are there any substantial constitutional questions at issue. It is not asserted that the rights of numerous par-

ties not present before this court might be affected by its decision, or that the case involves sensitivities that would impair the independence or impartiality of this decision. Where no cause is shown discretionary reference revocation is not justified.

## RECOMMENDATIONS

The reference should not be withdrawn pursuant to 28 U.S.C. § 157(d) for the following reasons:

(1) There are threshold issues to be decided which may render academic any consideration of the NGPA;

(2) In the event any consideration of the NGPA, a non-title 11 law of the United States involving intrastate gas prices which regulate organizations or activities affecting interstate commerce, is implicated, such application of the NGPA to this proceeding will not require substantial and material interpretation in the resolution of this proceeding but merely an application of the law to the facts. Therefore, mandatory withdrawal of the reference is not required under 28 U.S.C. § 157(d).

(3) There should be no discretionary withdrawal of the reference with respect to Texaco's Assumption Motion under 11 U.S.C. § 365 because the movants have not shown cause for such removal as required under 28 U.S.C. § 157(d).